United States Court of Appeals,

Fifth Circuit.

No. 94-40474

(Summary Calendar).

Cynthia SWEATMAN, Plaintiff-Appellant,

v.

COMMERCIAL UNION INSURANCE CO., et al., Defendants-Appellees.

Dec. 9, 1994.

Appeal from the United States District Court for the Western District of Louisiana.

Before SMITH, EMILIO M. GARZA and PARKER, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

After Metropolitan Life Insurance Company ("MetLife") denied Cynthia Sweatman's claim for disability benefits, Sweatman brought an action under ERISA, 29 U.S.C. § 1132(a)(1)(B) (1988), seeking district court review of MetLife's determination. The court upheld MetLife's decision, and Sweatman appeals. We AFFIRM.

I

Cynthia Sweatman worked for Commercial Union Insurance Co. ("Commercial Union") for nineteen years as a claims adjuster, a job that required her to climb ladders, inspect roofs, and crawl under houses. When Sweatman stopped working for Commercial Union, she timely submitted a statement of claim for benefits under Commercial Union's Long Term Disability Plan ("the Plan"). Sweatman claimed that her medical condition (listed as rheumatoid arthritis and/or

1

fibrositis) rendered her unable to perform any of her job duties.[1]

Under the terms of the Plan, Sweatman was eligible for long-term disability benefits if she was totally disabled. The Plan defines "total disability" as follows:

> "Total Disability" means that during the first 24 months of disability you are unable because of sickness or accident to perform the duties *of your own occupation* for any employer. Thereafter, "total disability" means the inability to perform *any occupation* for which you are fitted by training, education, or experience.

Record on Appeal, vol. 1, at 48. As claims administrator for the Plan,[2] MetLife sought to determine whether Sweatman was in fact "totally disabled." Shirley Darvasi, a claim reviewer employed by MetLife, attempted to gather Sweatman's medical records from her various physicians. At first, this task proved difficult. Dr. Burda, the physician who completed the Attending Physician Statement accompanying Sweatman's disability claim, did not promptly produce Sweatman's complete medical records.

To expedite its review of Sweatman's claim, MetLife sent the records it had received to Underwriting Medical Actuarial Consultants, Inc. ("UMAC"). Dr. Peter Blendonhy, a board certified physiatrist retained by UMAC, reviewed Sweatman's medical records and concluded that they did "not support limitations on work or physical activity." After UMAC's peer review board, the

---

[1]Pending determination of her disability claim, Sweatman received a percentage of her salary under Commercial Union's "salary continuation plan," which provided for such payments "in the event of an illness or accident resulting in [the] inability to work."

[2]In addition to acting as claims administrator, MetLife insured the plan.

"Physician's Roundtable," reviewed and concurred with Dr. Blendonhy's opinion, UMAC sent MetLife a report summarizing its findings. The report pointed to numerous deficiencies in Sweatman's medical records and noted that the diagnosis of rheumatoid arthritis had not been established according to the American Rheumatism Association's criteria.

Even after receiving UMAC's report, MetLife continued its efforts to obtain Sweatman's complete medical records. After repeatedly contacting the physicians listed on Sweatman's disability claim, MetLife was able to gather additional records. Because these records had not been considered by UMAC in its first review, MetLife forwarded the additional records to UMAC for a second review. Dr. Dwyer, an orthopedic surgeon, reviewed the complete records and concluded that they did not support the physical limitations that Sweatman claimed. After its Physician's Roundtable reviewed and concurred with Dr. Dwyer's opinion, UMAC issued a second report summarizing its findings. Specifically, UMAC found that Sweatman's lab work refuted a diagnosis of rheumatoid arthritis. UMAC also concluded that "the diagnosis of fibromyositis or fibromyalgia, if accepted, is certainly not substantiated to the degree that would disable Sweatman."

MetLife also hired Equifax Services ("Equifax") to investigate Sweatman's claim. An investigator working for Equifax interviewed Sweatman's neighbors and a local merchant who operated a business across the street from that of Sweatman's husband. None of these sources knew of Sweatman's disability. The neighbors reported that

Sweatman was taking care of her husband, who was confined to a wheelchair after suffering a stroke, on a full-time basis. The investigator also interviewed Sweatman and reported that she "moved about with no apparent restrictions or obvious signs of impairments."

Based on Sweatman's medical records, the two UMAC reports, the Equifax claim investigation, and its own employment-related information, Darvasi recommended in writing to her supervisor Allen Carson, a MetLife unit claims manager, that Sweatman's disability claim be denied. Carson reviewed the claim file and agreed that Sweatman was not totally disabled within the meaning of the Plan. MetLife then informed Sweatman by letter of the denial and explained its reasons for denying her claim. MetLife also explained that Sweatman could request reconsideration of her claim.

When Sweatman requested review of the denial, MetLife forwarded her file to Laura Sullivan, a "procedure analyst" at MetLife who had not been involved in the prior decision to deny Sweatman's claim. Sullivan reviewed the file and upheld the original determination. Consequently, MetLife informed Sweatman by letter of its decision to uphold the earlier denial.

Sweatman filed suit under ERISA, 29 U.S.C. § 1132(a)(1)(B) seeking district court review of MetLife's disability determination.[3] After a bench trial submitted on pleadings,

---

[3] 29 U.S.C. § 1132(a)(1)(B) provides that "[a] civil action may be brought ... by a participant or beneficiary ... to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

depositions, and the administrative record, the court held that MetLife did not abuse its discretion when it denied Sweatman's claim and entered judgment against Sweatman. Sweatman now appeals, alleging: (1) that the district court erroneously applied an abuse of discretion standard of review to MetLife's determination; and (2) that even if "abuse of discretion" was the proper standard, MetLife abused its discretion in determining that Sweatman was not "totally disabled."

## II

### A

Sweatman argues that the district court erroneously applied an abuse of discretion standard of review to MetLife's denial of her claim. In the Fifth Circuit, the proper standard for district court review of a plan administrator's benefit determination is governed by the Supreme Court's decision in *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), and our decision in *Pierre v. Connecticut General Life Insurance Co.,* 932 F.2d 1552 (5th Cir.), *cert. denied,* --- U.S. ----, 112 S.Ct. 453, 116 L.Ed.2d 470 (1991). In *Bruch,* the Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. at 115, 109 S.Ct. at 956-57. In *Pierre,* we held "that for factual determinations under ERISA plans, the abuse of discretion standard of review is the appropriate standard." 932

5

F.2d at 1562.[4]  Consequently, district courts in the Fifth Circuit review under an abuse of discretion standard a plan administrator's factual determinations and determinations made pursuant to a plan that gives the administrator discretionary authority to determine eligibility or interpret the terms of the plan.

Sweatman concedes that MetLife's determination that she was not disabled was "more factual in nature than interpretive in nature," and therefore is ordinarily subject to abuse of discretion review by the district court under *Pierre.*  However, she argues that two special circumstances in her case warrant heightened scrutiny of MetLife's decision.

1

First, she argues that because she was deprived of the "full and fair review" of her claim required by ERISA, 29 U.S.C. § 1133(2) (1988), the district court should have reviewed MetLife's decision *de novo.*  We do not reach this issue[5] because in this case MetLife conducted a "full and fair review" of Sweatman's claim.

Section 1133(2) provides that "every employee benefit plan shall ... afford a reasonable opportunity to any participant whose

_____

[4]We recently reaffirmed this standard in *Southern Farm Bureau Life Insurance Co. v. Moore,* 993 F.2d 98, 101 (5th Cir.1993).

[5]Sweatman cites no authority for the proposition that noncompliance with § 1133(2) would warrant heightened scrutiny of MetLife's disability determination.  In *Weaver v. Phoenix Home Life Mutual Insurance Co.,* 990 F.2d 154 (4th Cir.1993), the Fourth Circuit held that a plan administrator's noncompliance with § 1133(1) was evidence of abuse of discretion, but the court did not apply a heightened standard of review.  *See id.* at 158-59.

claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."[6] Other circuits have explained that "full and fair review means "knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of the evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision.' " *Sage v. Automation, Inc. Pension Plan & Trust,* 845 F.2d 885, 893-94 (10th Cir.1988) (quoting *Grossmuller v. International Union Local 813,* 715 F.2d 853, 858 n. 5 (3d Cir.1983)).

Sweatman argues that MetLife's review of her claim was inadequate because "the word "review' contemplates an examination and evaluation of the file by someone other than the various people who initially denied the claim." This argument is both legally and factually inaccurate. The word "review" does not connote examination by a second party. Instead, "review" means "to view,

___

[6]The Department of Labor's regulations further elaborate on the "full and fair review" requirement of 29 U.S.C. § 1133(2):

> Every plan shall establish and maintain a procedure by which a claimant or his duly authorized representative has a reasonable opportunity to appeal a denied claim to an appropriate named fiduciary or to a person designated by such fiduciary, and under which a full and fair review of the claim and its denial may be obtained. Every such procedure shall include but not be limited to provisions that a claimant or his duly authorized representative may: (i) Request a review upon written application to the plan; (ii) Review pertinent documents; and (iii) Submit issues and comments in writing.

29 C.F.R. § 2560.503-1(g) (1993).

7

look at, or look over again." The Random House College Dictionary 1130 (Rev. ed. 1980); *see also* Black's Law Dictionary 1320 (6th ed. 1990) ("Review. To re-examine judicially or administratively. A reconsideration; second view or examination; revision; consideration for purposes of correction."). We have found no case law supporting Sweatman's interpretation of "review" as it appears in § 1133(2). To the contrary, courts have held that a plan administrator's reconsideration of its prior decision satisfies § 1133(2). *See, e.g., Brown v. Retirement Comm.,* 797 F.2d 521, 534-35 (7th Cir.1986) (committee's review of its own decision "satisfied the section 1133 requirement of a full and fair review by the appropriate named fiduciary"), *cert. denied,* 479 U.S. 1094, 107 S.Ct. 1311, 94 L.Ed.2d 165 (1987); *see also Davidson v. Prudential Ins. Co.,* 953 F.2d 1093, 1096 (8th Cir.1992) (Prudential's reconsideration of permanent disability claim three times was "full and fair review").

Furthermore, even if § 1133(2) required review by a second decision-maker, MetLife's procedure did involve such review. As Sweatman acknowledges in her brief, Laura Sullivan, who was not involved in the original disability determination, reviewed Sweatman's file and the recommendations of Shirley Darvasi, "the original claim reviewer." We cannot agree that a second review of the recommendations of an "original reviewer" does not amount to a "review" as contemplated by § 1133(2).[7]

---

[7]Sweatman also argues that Sullivan could not have adequately reviewed Sweatman's claim because "Paragraph 6 of her affidavit states that, "based upon my ERISA review of MetLife's

8

Sweatman has not pointed to any other procedural deficiency in MetLife's review of her claim. Therefore, we hold that the district court properly declined Sweatman's request that it review MetLife's decision with heightened scrutiny on the grounds that MetLife failed to comply with § 1133(2).

2

Sweatman also argues that MetLife's inherent conflict of interest as plan administrator and benefit insurer warranted heightened scrutiny by the district court. We have previously held, however, that a conflict of interest does not change the standard of review. *Salley v. DuPont de Nemours & Co.*, 966 F.2d 1011, 1014 (5th Cir.1992). Instead, the district court should weigh any potential conflict of interest in its determination of whether the plan administrator abused its discretion. *Id.; Haubold v. Intermedics, Inc.*, 11 F.3d 1333, 1337 (5th Cir.1994).[8]

denial decision, MetLife again determined that Ms. Sweatman was not totally disabled from performing her job and, therefore, upheld the decision to deny benefits.' " This statement is inaccurate, according to Sweatman, because Drs. Dwyer and Blendonhy "did not base their decisions upon any conclusion that she wasn't disabled but, in fact, denied the claim because they did not believe there were sufficient records of medical findings to support the disability opinion offered by plaintiff's treating physicians." This argument assumes that UMAC played a greater role than it actually did in MetLife's disability determination process. MetLife asked Drs. Dwyer and Blendonhy to review Sweatman's medical records to ascertain whether the documents supported Sweatman's claimed physical limitations. With the benefit of these opinions, MetLife, the plan administrator, made the ultimate determination that Sweatman was not totally disabled. *See infra* part II.B.2.

    [8]*See also Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1306 (5th Cir.1994) (plan administrator's possible conflict of interest did not change abuse of discretion standard of review); *Callahan v. Rouge Steel Co.*, 941 F.2d 456, 459 (6th Cir.1991) (conflict of

9

In this case, the district court properly reviewed MetLife's decision under the abuse of discretion standard, weighing MetLife's conflict of interest as a factor in that review.

B

Sweatman argues in the alternative that even if the court applied the proper standard of review, it erroneously concluded that MetLife did not abuse its discretion.  Both parties cast our standard of review on appeal as whether the district court's "finding" was erroneous.  However, Sweatman attacks not the district court's findings of fact, but rather the district court's holding that the plan administrator's denial of benefits was not an abuse of discretion.  The posture of this case requires us to clarify the proper standard of review on appeal from a district court's review of a denial of benefits under § 1132(a)(1)(B).

1

The Supreme Court's holding in *Bruch* that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the plan administrator or fiduciary discretionary authority to determine

---

interest is a factor to be considered in determining whether plan administrator abused its discretion)*;  Brown v. Blue Cross & Blue Shield,* 898 F.2d 1556, 1563 (11th Cir.1990) (arbitrary and capricious standard applies to case in which administrator is insurer, but application of the standard is shaped by the circumstances of the inherent conflict of interest), *cert. denied,* 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991). *Contra Bogue v. Ampex Corp.,* 976 F.2d 1319, 1325 (9th Cir.1992) ("This court has confirmed that less deference applies when the administrator's decision involves a "serious conflict' between the administrator and the employee."), *cert. denied,* --- U.S. ----, 113 S.Ct. 1847, 123 L.Ed.2d 471 (1993).

10

eligibility for benefits or to construe the terms of the plan," 489 U.S. at 115, 109 S.Ct. at 956-57, describes the district court's standard of review—not that of the Court of Appeals.[9]  Plaintiffs who file suit under § 1132(a)(1)(B) to challenge denials of benefits do so in district court, and the district court reviews the plan administrator's decision.  Then, if a party appeals the district court's judgment, we review its decision.  On appeal, our standard of review for district court decisions reviewing plan administrators' eligibility determinations is guided by the principles that typically guide our standard of review.  Namely, we review questions of law *de novo* and set aside factual determinations only if clearly erroneous.  *Odom v. Frank,* 3 F.3d 839, 843 (5th Cir.1993).  Consistent with these principles, we review a district court's determination of whether a plan administrator abused its discretion—a mixed question of law and fact—*de novo.*[10]  Our review of the district court's holding will then require us to apply *Bruch* and *Pierre* to determine what

---

[9]Similarly, our holding in *Pierre* "that for factual determinations under ERISA plans, the abuse of discretion standard of review is the appropriate standard," 932 F.2d at 1562, also describes the district court's standard of review.

[10]*Cf. Phillips v. Alaska Hotel & Restaurant Employees Pension Fund,* 944 F.2d 509, 515 (9th Cir.1991) (question whether pension plan trustees acted arbitrarily and capriciously is mixed question of law and fact;  ultimate conclusions are reviewed *de novo* while underlying facts are reviewed for clear error), *cert. denied,* --- U.S. ----, 112 S.Ct. 1942, 118 L.Ed.2d 548 (1992); *Brown v. Blue Cross & Blue Shield,* 898 F.2d 1556, 1559 (11th Cir.1990) (clarifying that district court's holding on question of whether plan administrator's determination was arbitrary and capricious is a matter of law subject to *de novo* review), *cert. denied,* 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991).

standard of review applies to the plan administrator's decision. *See Sandoval v. Aetna Life and Casualty Ins. Co.,* 967 F.2d 377, 380 (10th Cir.1992) ("The district court's holding that the administrator's decision was not arbitrary and capricious is a legal conclusion.  Hence, our review of the district court's decision, although not the underlying administrator's decision, is plenary.").

Previous cases in this circuit have applied the proper standard of review for potentially conflicting reasons.  In some cases, we have applied the *Bruch* and *Pierre* tests to determine our standard of review of the plan administrator's decision.  For example, in *Vasseur v. Halliburton Co.,* 950 F.2d 1002 (5th Cir.1992), we explained that "[b]ecause the applicable plan gives the plan administrator discretion to construe plan terms, the arbitrary and capricious standard applies," *id.* at 1006, and held that "[t]he plan administrator's decision ... was not arbitrary and capricious."  *Id.* at 1007.[11]  While these cases properly review the district court's decision *de novo,* they only implicitly recognize the fact that as a court of appeals we review the district court's decision and not the plan administrator's determination directly.[12]

---

[11]*Accord Salley v. E.I. DuPont de Nemours & Co.,* 966 F.2d 1011, 1014 (5th Cir.1992);  *Batchelor v. IBEW, Local 861 Pension and Retirement Fund,* 877 F.2d 441, 442-43 (5th Cir.1989).

[12]The one case in which we did recognize the fact that on appeal we review a district court's decision reviewing a plan administrator's determination is *Cathey v. Dow Chemical Co. Medical Care Program,* 907 F.2d 554 (5th Cir.1990), *cert. denied,* 498 U.S. 1087, 111 S.Ct. 964, 112 L.Ed.2d 1051 (1991).  There we explained:  "Accordingly, the New Plan cannot be read as granting discretion expressly, and thus we will review *de novo* the

Other decisions have applied the *Bruch* standard to determine our standard of review of the *district court* 's decision. In *Schultz v. Metropolitan Life Ins. Co.,* 872 F.2d 676 (5th Cir.1989), we explained our standard as follows: "Neither party has pointed to any provision in the Plan which gives the administrator discretionary authority to determine benefit eligibility or to construe the plan terms. Accordingly, the district court's review of the administrator's denial of the Schultz claim will be tested here based on a *de novo* standard." *Id.* at 678; *accord Wise v. El Paso Natural Gas Co.,* 986 F.2d 929 (5th Cir.1993) (citing *Schultz,* 872 F.2d at 678), *cert. denied,* --- U.S. ----, 114 S.Ct. 196, 126 L.Ed.2d 154 (1993). These cases also apply the proper standard—*de novo* review of the district court's decision—but they imply that if a plan does give the plan administrator discretion, then we would review the district court's decision under an abuse of discretion standard. However, this implication is inconsistent with the general rule in this circuit that we review mixed questions of law and fact *de novo. E.g., United States v. Faubion,* 19 F.3d 226, 228 (5th Cir.1994).

Finally, some cases have suggested that all actions brought under 29 U.S.C. § 1132(a)(1)(B) are reviewed *de novo* on appeal. *See, e.g., Godwin v. Sun Life Assur. Co.,* 980 F.2d 323, 329 (5th Cir.1992) ("Because this is an action brought under 29 U.S.C. §

---

fiduciary's denial of Cathey's nursing claims here. Having the benefit of prior judicial review, however, we will not upset the district court's factual determinations unless they are clearly erroneous." *Id.* at 560.

13

1132(a)(1)(B), we review *de novo* the district court's decision.") (citing *Bruch,* 489 U.S. at 115, 109 S.Ct. at 956); *Jones v. Sonat, Inc. Employee Benefit Plan Admin. Comm.,* 997 F.2d 113, 115 (5th Cir.1993) (same) (citing *Goodwin,* 980 F.2d at 329). Again, while these cases reach the proper result—*de novo* review of the district court's decision upholding or overruling the plan administrator's decision—they are potentially misleading because our standard of review does not derive from § 1132(a)(1)(B).[13] Furthermore, we apply the "clearly erroneous" standard to a district court's findings of fact in an action under § 1132(a)(1)(B). *Cathey,* 907 F.2d at 560.

In sum, while none of our cases have applied an incorrect standard of review to a district court's decision in a § 1132(a)(1)(B) case, their conflicting explanations of the applicable standard of review warrant clarification. The Supreme Court's decision in *Bruch* and our decision in *Pierre* determine the proper standard of review in a § 1132(a)(1)(B) action for review of a plan administrator's determination of benefits. On appeal from a district court's judgment in a § 1132(a)(1)(B) case, our traditional standards of review apply, and we review *de novo* the district court's holding on the question of whether the plan administrator abused its discretion or properly denied a claim for

---

[13]As we explained in *Wise v. El Paso Natural Gas Co.,* 986 F.2d 929 (5th Cir.1993), "[a]lthough it is a "comprehensive and reticulated statute,' ... ERISA fails to set out the applicable standard of review for actions under § 1132(a)(1)(B) challenging benefit eligibility determinations." *Id.* at 933 (quoting *Nachman Corp. v. PBGC,* 446 U.S. 359, 361, 100 S.Ct. 1723, 1726, 64 L.Ed.2d 354 (1980)).

benefits. However, we will set aside the district court's factual findings underlying its review of the plan administrator's determination only if clearly erroneous.

2

The parties in this case agree that Sweatman asked the district court to review MetLife's factual determination that she was not permanently disabled. The district court held that MetLife did not abuse its discretion, a holding we review *de novo.* *See* *supra* part II.B.1. Consequently, under *Pierre,* we must determine whether MetLife's decision amounted to an abuse of its discretion. 932 F.2d at 1562. "In applying the abuse of discretion standard, we analyze whether the plan administrator acted arbitrarily or capriciously." *Salley v. E.I. DuPont de Nemours & Co.,* 966 F.2d 1011, 1014 (5th Cir.1992).

Sweatman essentially argues that MetLife made the wrong decision because it attached insufficient weight to her doctors' opinions and too much weight to the results of its own investigation, which Sweatman alleges was deficient. MetLife considered all of the medical records Sweatman submitted in support of her disability claim, contracted independent medical consultants to evaluate those records and determine whether they supported her physical limitations,[14] hired an investigator to interview and

---

[14]Sweatman argues that because Drs. Blendonhy and Dwyer review twenty to thirty files per month for UMAC, they are "financially dependent upon UMAC [which, Sweatman argues, is in turn financially dependent on MetLife] and ... by no means "independent' or "impartial.' " This argument lacks merit. First, UMAC's doctors are independent consultants because MetLife hires UMAC on a contractual basis. Second, even assuming the

investigate Sweatman, and reviewed the entire administrative record twice.

The record generated by these evaluations contains ample evidence to support MetLife's finding that Sweatman was not permanently disabled. Specifically, the UMAC reports explained that Sweatman's own medical records did not support a diagnosis of rheumatoid arthritis. UMAC's second report found that "the diagnosis of fibromyositis or fibromyalgia, if accepted, is certainly not substantiated to the degree that would disable Sweatman." After reviewing the record and considering MetLife's

issue were relevant, Sweatman points to no evidence in the record that proves that Drs. Dwyer and Blendonhy are "financially dependent" on UMAC or that UMAC depends on MetLife. The number of files they review per month proves nothing about their financial status. Finally, we note that the only way for MetLife to satisfy Sweatman's standard for impartiality would be to seek physicians willing to volunteer their time to review the medical files of disability claimants.

Sweatman also argues that Dr. Blendonhy's opinion is worthless because he did not review all of Sweatman's medical records. It is true that Dr. Blendonhy examined only those records that Sweatman had submitted to MetLife at the time of his review. However, when Sweatman submitted additional records, some of which filled gaps identified by Dr. Blendonhy, MetLife resubmitted the complete records for UMAC's consideration. Sweatman does not dispute that Dr. Dwyer based his opinion on all of the records Sweatman submitted to MetLife. Consequently, even if Dr. Blendonhy's opinion were based on an insufficient record, Dr. Dwyer's opinion and MetLife's ultimate benefit determination were based on Sweatman's complete medical records.

Sweatman also contends that UMAC's "Physician's Roundtable" has no evidentiary value whatsoever, and in fact "is nothing more than a bucket of whitewash which is legitimated by the professional degrees of those that participate." However, Sweatman's characterization of UMAC's peer review process does not change the fact that UMAC's report contains ample evidence supporting MetLife's determination.

16

dual role as plan administrator and insurer, we agree with the district court that MetLife's disability determination was not an abuse of discretion. *See Donato v. Metropolitan Life Ins. Co.,* 19 F.3d 375, 380 (7th Cir.1994) (MetLife's denial of benefits was not arbitrary and capricious when its "decision simply came down to a permissible choice between the position of UMAC, MetLife's independent medical consultant, and the position of [the claimant's physicians].").

Citing our decision in *Salley,* Sweatman argues that MetLife abused its discretion because it failed to obtain necessary information and selectively relied on only part of her treating physicians' diagnoses. In *Salley,* the plaintiff, a teenager with a history of emotional disabilities, drug abuse, and depression, had been admitted to a hospital three times for psychiatric care. 966 F.2d at 1012. After she had been hospitalized for almost a month during her third admission, Salley's treating psychiatrist, Dr. Blundell, found that her condition had improved dramatically. *Id.* at 1013. However, he concluded she should remain as an inpatient until a suitable environment could be found to avoid a regression to her previous behavior. *Id.* DuPont ultimately terminated Salley's inpatient hospitalization benefits based on a determination by Preferred Health Care ("Preferred") that continued hospitalization was not medically necessary. *Id.* Preferred's case manager Ron Schlegel and its psychiatrist Dr. Ahluwalia had spoken with Dr. Blundell about Salley's improved condition, examined the medical records of Salley's first admission, and concluded that

17

continued hospitalization was not medically necessary.  *Id.*  We held that:

> [A]lthough DuPont followed the prescribed procedures, it abused its discretion in relying upon the Schlegel and Dr. Ahluwalia recommendation to terminate [Salley's] benefits. Because they chose to follow Dr. Blundell's diagnosis, Schlegel and Dr. Ahluwalia were required, *absent independent inquiry,* to follow all his advice, not just part of it.  If they decided to deviate from his diagnosis, they were required to investigate further the medical necessity of in-patient hospitalization.  Whether this investigation included an examination of [Salley] *or an analysis of hospital records* depended on the particulars of each case.  At the very least, however, administrators relying on hospital records obviously must review the most recent records.  The case administrator and the physician conceded at trial that they did not do so.

*Id.* at 1015-16 (emphasis added).  In this case, MetLife investigated Sweatman's condition and analyzed all of her hospital records.  When Sweatman submitted additional records after Dr. Blendonhy's review, MetLife sought another opinion from UMAC regarding whether her records supported the physical limitations found by her treating physicians.  Furthermore, MetLife did not rely on Sweatman's physicians' diagnoses only to ignore their advised treatment.  Rather, MetLife denied Sweatman's claim for disability benefits based on the opinions of Drs. Dwyer and Blendonhy disagreeing with those of Sweatman's physicians. Finally, we note that *Salley* involved a determination of "medical necessity" and not a claim for disability benefits.

Sweatman also argues that because she received a percentage of her salary under Commercial Union's "salary continuation plan," she is entitled to a presumption of total disability, and that MetLife did not rebut this presumption with evidence of a change in her condition.  Sweatman cites no authority for such a rule, and we

18

see no need to create one in this case. Furthermore, there is no evidence in the record that payments under the salary continuation plan depend on a finding of total disability. The parties stipulated at trial that a beneficiary is entitled to such benefits "in the event of an illness or accident resulting in [the] inability to work." However, the terms of the salary continuation plan are not contained in the record, and the Long Term Disability Plan makes no reference to such benefits.

The remainder of Sweatman's arguments simply overstate UMAC's role in MetLife's disability determination. Sweatman argues that MetLife abused its discretion because Drs. Blendonhy and Dwyer were not asked whether Sweatman was "totally disabled" but rather only whether her medical records supported the physical limitations she claimed. Sweatman also argues that Drs. Dwyer and Blendonhy were not qualified to determine whether she was "totally disabled" within the meaning of the Plan because they were not familiar with what her occupation entailed. Both of these arguments are beside the point because MetLife, not Drs. Dwyer and Blendonhy, was responsible for the ultimate determination of whether Sweatman was "totally disabled." MetLife consulted the UMAC physicians only on the question of whether Sweatman's own records supported the physical limitations that she claimed.[15] In fact, had MetLife

_____

[15]Sweatman also argues that Drs. Dwyer and Blendonhy were not qualified to render their opinions because they do not practice in Louisiana where Sweatman was diagnosed and do not specialize in the same areas as her primary treating physicians. These arguments similarly assume too great a role for UMAC's physicians. Drs. Blendonhy and Dwyer were asked to determine only whether the contents of Sweatman's medical records supported

19

delegated its decision to grant or deny disability benefits to UMAC, it might have run afoul of its fiduciary duty under the Plan. *Cf. Salley,* 966 F.2d at 1014 ("As long as a company maintains the ultimate decision on denial of benefits, it can be beneficial for it to have experienced agents assist in the determination.").

In sum, in light of the ample evidence supporting MetLife's "total disability" determination, and recognizing MetLife's dual role as claims administrator and insurer, we hold that the district court properly upheld MetLife's denial of Sweatman's claim.

III

For the foregoing reasons, we AFFIRM.

---

her claimed physical limitations. Sweatman fails to show that Drs. Blendonhy and Dwyer were not qualified to make this limited determination.