**Geraldine MILSON**

v.

**ST LUKE'S EPISCOPAL HOSPITAL, et al.**

**No. Civ.A. H–98–1766.**

United States District Court, S.D. Texas, Houston Division.

Aug. 2, 1999.

Dougal C. Pope, Attorney at Law, Houston, TX, Mason Craig Meyer, Conroe, TX, Barbara J. Maseberg, Houston, TX, for Geraldine Milson, plaintiff.

Carolyn R. Konicek, Carrinton Coleman, Dallas, TX, Clayton Edward Bailey, Wolin Ridley, Dallas, TX, for St. Luke's Episcopal Hospital, Administrator of St. Luke's Episcopal Hospital Long Term Disability Plan, defendant.

## ORDER

GILMORE, District Judge.

Pending before the Court are motions for summary judgment filed by Plaintiff and Defendants. (Instrument Nos. 22 and 23). Based on the parties' submissions and the applicable law, the Court finds that Plaintiff's motion should be **DENIED** and that Defendants' motion should be **GRANTED.**

## I.

Plaintiff Geraldine Milson ("Milson") brings this action against Defendants St. Luke's Episcopal Hospital ("St.Luke's"), Administrator of St. Luke's Episcopal Hospital Long Term Disability Plan, and Metropolitan Life Insurance Company ("MetLife") under the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), requesting this Court to review MetLife's denial of her claim for long-term disability ("LTD") benefits.

Milson began her employment with St. Luke's in August of 1989 as an Environmental Assistant or a housekeeper. (Plaintiff's Motion, Instrument No. 23, at 4). As an Environmental Assistant, Milson was required "to dust, spot clean, empty trash, and inspect for an report any possible repairs which might be necessary." (Defendants' Motion, Instrument No. 22, at 3 and Exh. 2).

St. Luke's established and maintained an employee welfare benefit plan (the "Plan") for its employees. Initially, the Travelers Indemnity Company of Rhode Island ("Travelers") served as the claims administrator for the Plan. (Plaintiff's Motion, Instrument No. 23, at 5). Currently, "MetLife serves as the claims administrator with responsibility for processing and evaluating claims for LTD benefits made by participants of the Plan." (Defendants' Motion, Instrument No. 22, Appendix, at 1). St. Luke's is the Plan Administrator. (*Id.*).

On or about March 18, 1991, Milson allegedly sustained a back injury while attempting to move a filing cabinet. (*Id.* at 5). Travelers received Milson's Statement of Claim for LTD benefits and Attending Physician's Statement on September 10, 1991. In her Statement of Claim, Milson claimed to suffer from several conditions, including ruptures of two discs, swelling in her upper back, and numbness in her left hand and legs. (Defendants' Motion, Instrument No. 22, Exh. 3). Mil-

son also stated that she had been treated by Dr. Barry Martin ("Martin") and Dr. Day P. McNeel ("McNeel"). The Attending Physician's Statement, which was completed by McNeel, indicated that Milson suffered from cervical herniated and a thoracic sprain. (*Id.*). McNeel also stated that Milson experienced pain in her upper back between her shoulder blades, neck pain, and headaches. (*Id.*). McNeel concluded that Milson was totally disabled and not a suitable candidate for trial employment. (*Id.*).

Then, in a letter dated September 26, 1991, Travelers requested additional information from Martin and McNeel so that the company could evaluate Milson's disability. (Defendant's Motion, Instrument No. 22, Exh. 4). Travelers asked the doctors to provide "a detailed narrative report summarizing ... [Milson's] past and present medical history including a complete diagnosis, prescribed medication(s), treatment and prognosis." (*Id.*).

After reviewing the additional documents and information, Travelers approved Milson's claim for LTD benefits on November 11, 1991. (Defendants' Motion, Instrument No. 22, Exh. 5). Travelers determined that Milson became disabled on April 26, 1991, and that her benefits began on July 26, 1991. (*Id.*). Travelers also informed Milson that she had to be "Totally Disabled" as defined in the Plan in order to continue to receive LTD benefits. (*Id.*). The Plan provides that:

[t]o be considered Totally Disabled, you must meet the following requirements: During the first 36 months of disability, you must be unable to perform all the normal duties of your regular occupation for any employer and you must at no time engage in any occupation or employment for pay or profit. This must be due to your disability. The travelers will decide if this is the case.

After the first 36 months of your disability, you must be completely unable to engage in any occupation or employment for which you are or become qualified.

You could be qualified because of your education, training, or experience.

All time you spend completing the Qualifying Disability Period will count in the 36 months.

(Defendants' Motion, Instrument No. 22, Exh. 1, at 19–20). The first 36 months of disability (where the participant is unable to perform his own job) is referred to as Phase I. Phase II comprises the period after the first 36 months of the participant's disability (where the participant is unable to perform any job for which he/she is qualified).

On September 5, 1992, Milson was awarded social security benefits. The Administrative Law Judge allegedly concluded that "Milson's physical impairments of herniated discs and bulging discs in the cervical, thoracic and lumbar spine were severe." (Plaintiff's Motion, Instrument No. 23, at 11). According to Milson, she still receives social security benefits and was awarded supplementary benefits in December of 1996. (Plaintiff's Motion, Instrument No. 23, at 11).

On February 2, 1994, Travelers sent Milson a letter reminding her that she had to be totally disabled from any occupation in order to continue to receive LTD benefits after July 26, 1994. (Defendants' Motion, Instrument No. 22, Exh. 6). Travelers informed Milson that it was reviewing her claim to determine whether she was totally disabled from any occupation and requested Milson to complete a Personal Profile Evaluation and Medical Authorization. (*Id.*). Travelers also requested Milson to have her physician complete the Attending Physician's Statement and a Physical Capacity Form. (*Id.*).

Dr. Martin completed the Attending Physician's Statement on February 25, 1994, and indicated that Milson's progress was unchanged. (*Id.*). Martin stated that Milson could reach above shoulder level, operate a motor vehicle, but could not climb, twist, bend or stoop. (*Id.*). Martin also reported that she could sit, stand, and

walk for approximately one (1) hour. (*Id.*). Martin further indicated that Milson could only occasionally lift up to twenty (20) pounds. (*Id.*). On the Personal Profile Evaluation, Milson stated that her back, spine, and shoulders hurt constantly, that she could not turn her neck, and that she experienced swelling on the right side of her throat and numbness in her legs. (*Id.*).

Then, on April 7, 1994, Travelers requested that Dr. Martin complete an Orthopedic Questionnaire and indicate whether Milson was experiencing any neurological deficits based on her herniated disc. (*Id.*). Travelers also asked Martin whether he believed Milson would be able to perform sedentary work activity. (*Id.*). On February 5, 1995, Travelers sent Milson a Personal Profile and Claimant's Authorization Form for her to complete. Travelers also asked Milson to have her physician complete the enclosed Physical Capacity Form and Orthopedic Evaluation Form. (Defendants' Motion, Instrument No. 22, Exh. 7). Travelers made additional attempts to contact Martin and Milson and receive additional medical information. (Defendants' Motion, Instrument No. 22, at 5 and Exhs. 8 and 9). MetLife maintains that Traveler's request for information was never answered. (Defendants' Motion, Instrument No. 22, at 5).

Therefore, on December 8, 1995, Travelers informed Milson that it was "withdrawing ... [her] ... [LTD] benefits [effective November 25, 1995] for lack of sufficient medical objective findings to determine [her] 'total disability' status at the 'any occupation' level." (Defendants' Motion, Instrument No. 22, Exh. 10). Milson requested an appeal of Traveler's decision to terminate her LTD benefits. (Defendants' Motion, Instrument No. 22, Exh. 11). Thereafter, Travelers received an Attending Physician's Statement, Physician's Report of Physical Capacity and Medical Condition Questionnaire from Dr. Martin.

Martin also faxed to Travelers office notes and other documentation concerning Milson's condition.

The Attending Physician's Statement was supposedly completed by Martin in June of 1995. In this report, Martin indicated that Milson's condition remained unchanged. (Defendants' Motion, Instrument No. 22, Exh. 12). Martin reported that Milson could occasionally lift up to twenty (20) pounds and could operate a motor vehicle, but stated that Milson could not climb, twist, bend or stoop. (*Id.*). Martin also indicated that Milson could not perform any repetitive movements, such as fine finger movements and eye/hand movements. (*Id.*).

However, in the Physician's Report of Physical Capacity, allegedly completed by Martin in June of 1995,[1] Martin reported that Milson could sit for three (3) to four (4) hours, and could stand, walk, bend over, and twist for one (1) to two (2) hours. (*Id.*). Martin also noted that Milson could perform balancing, pushing, pulling, repetitive use of foot control, repetitive use of hand, simple light grasping, fine finger dexterity, and looking up and down movements for one (1) to two (2) hours. (*Id.*). In addition, Martin documented that Milson had the ability to lift or carry up to twenty-five (25) pounds occasionally. (*Id.*). Furthermore, Martin reported that Milson could operate a motor vehicle. (*Id.*). Martin also recommended that floor-level lifting by Milson be restricted to ten (10) pounds, waist-level lifting be limited to twenty (20) pounds, standing for walking be restricted to four (4) hours per day, and that Milson only be permitted to sit up to six (6) hours per day. (*Id.*). With respect to Milson's ability to work, Martin stated that, in his opinion, Milson would never be able to work at her current occupation and that it was doubtful whether Milson would ever be able to work in any other position for which she was qualified. (*Id.*).

---

1. The record indicates that this report was not received by Travelers until December 14, 1995. (Defendants' Motion, Instrument No. 22, Exh. 12).

Travelers also received a report dated August 8, 1995, from Dr. Martin Grabois ("Grabois"). Grabois made the following findings based on a physical examination of Milson: (1) no limb length discrepancy or local spinal tenderness; (2) no myofascial trigger points in the paraspinal muscles or gluteals; (3) fairly symmetrical range of motion of the spine with limitation detected in all directions; (4) no reversal of the lumbar curve, but a loss of lateral flexion to both sides; (5) no indication of facet joint disease; (6) minimal weakness in hip flexion and knee extension; (6) normal distal function at the left ankle; (7) no sensory loss in lower extremities; (8) straight leg raising was limited to about sixty (60) degrees; (9) no radicular pain or sacroilic joint tenderness detected; and (10) examinee complained of hamstring tightness. (Defendants' Motion, Instrument No. 22, Exh. 13). Grabois also wrote that, in his opinion, Milson suffered from chronic pain involving the whole back. (Id.).

MetLife, who assumed Travelers's responsibilities as the claims administrator for the Plan, then obtained a review of Milson's condition from Rick Velghe ("Velghe"), a physical therapist and assessment specialist, on February 29, 1996. Velghe reported the following:

Ms. Milson di[s]played several inconsistent behaviors during the 4 hour assessment. During the initial interview she reported that her pain does not vary from 10/10. Later, during the same interview session, she reports that her pain and anti-inflammatory medications are required to diminish her pain. Additionally, she carried a small gauge, straight cane during the evaluation and held it even while sitting. She displayed sufficient balance without the cane during gait activities and while carrying a weighted load. I never observed her using the cane as a true assistive device. During the chair to floor lifting task she displayed a quite remarkable pattern; carrying the final weight of 12# with a flexed posture while turning 180 degrees. This would ordinarily be a very stressful posture for one with either discogenic or mechanical back pathology.

(Defendants' Motion, Instrument No. 22, Exh. 14). Velghe then concluded that Milson was "able to work in the Sedentary physical capacity level based on her occasional lifting capabilities." (Id.).

On August 5, 1996, after reviewing the medical assessments and vocational report concerning Milson's condition, MetLife terminated Milson's LTD benefits effective August 25, 1996. (Defendants' motion Instrument No. 22, Exh. 15). MetLife reasoned that there was a lack of sufficient medical objective findings to determine Milson's "total disability" status at the "any occupation level." (Id.). MetLife also stated that, based on the Department of Labor's Physical Demand Levels, Milson was capable of working in the "Sedentary Physical Capacity" level. (Id.). Milson requested an appeal of MetLife's termination of her LTD benefits on August 8, 1996.

Then, on October 4, 1996, Loretta D. Appleton ("Appleton"), a rehabilitation coordinator, prepared a transferable skills analysis of Milson. (Defendants' Motion, Instrument No. 22, Exh. 16). Purportedly, after reviewing Milson's entire file, Appleton identified the following four (4) sedentary occupations for which Milson had the skills to perform: (1) charge account clerk; (2) telephone solicitor; (3) call out operator; and (4) surveillance system monitor. (Id.). MetLife then upheld its decision to terminate Milson's LTD benefits on October 8, 1996. (Defendants' motion, Instrument No. 22, Exh. 17).

On May 11, 1998, Milson filed this suit against St. Luke's, Administrator of St. Luke's Episcopal Hospital Long Term Disability Plan, and MetLife, requesting this Court to review MetLife's decision to terminate her LTD benefits. (Instrument No. 1).

Defendants filed a motion for summary judgment on April 30, 1999, arguing that MetLife's decision to withdraw Milson's LTD benefits must be upheld since its determination was reasonable, based on substantial evidence, and not arbitrary and capricious. (Defendants' Motion, Instrument No. 22, at 3). Milson also filed a motion for summary judgment on this same day. Milson contends that de novo is the appropriate standard of review for MetLife's decision to terminate her benefits since the Plan does not grant MetLife any discretionary authority. In the alternative, Milson argues that the Court should substantially reduce the degree of deference afforded MetLife under the abuse of discretion standard because the company has an inherent conflict. Milson also maintains that MetLife's determination was an abuse of discretion because it was unsupported by substantial evidence and because it conflicted with the Social Security Administration's ("SSA's") decision to award Milson disability benefits.[2]

### III.

Summary judgment is appropriate in cases in which there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Anderson,* 106 S.Ct. at

2510. If the evidence rebutting the motion for summary judgment is only colorable or not significantly probative, summary judgment should be granted. *Anderson,* 106 S.Ct. at 2511; *see Lewis v. Glendel Drilling Co.,* 898 F.2d 1083, 1088 (5th Cir.1990), *cert. denied,* 502 U.S. 857, 112 S.Ct. 171, 116 L.Ed.2d 134 (1991).

Under Fed.R.Civ.P. 56(c), the moving party bears the initial burden of informing the district court of the basis for its belief that there is an absence of a genuine issue for trial, and for identifying those portions of the record that demonstrate such absence. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Leonard v. Dixie Well Serv. & Supply, Inc.,* 828 F.2d 291, 294 (5th Cir. 1987).

Where the moving party has met its Rule 56(c) burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts ... [T]he nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.'*" *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1356 (quoting Fed.R.Civ.P. 56(e)) (emphasis in original); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Leonard,* 828 F.2d at 294. To sustain the burden, the nonmoving party must produce evidence admissible at trial. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2514; *Thomas v. Price,* 975 F.2d 231, 235 (5th Cir.1992) ("To avoid a summary judgment, the nonmoving party must adduce admissible evidence which creates a fact issue....").

---

2. As mentioned, Milson argues that MetLife abused its discretion because its decision conflicted with the favorable decision of the SSA to award her disability benefits. However, the Court did not find and Milson did not provide any legal authority supporting her proposition. Rather, courts have refused to hold that an ERISA administrator or fiduciary must adhere to a benefit determination by the SSA. *See Anderson v. Operative Plasterers' and Cement Masons' International Assoc. Local No. 12 Pension and Welfare Plans,* 991 F.2d

356 (7th Cir.1993); *Madden v. ITT Long Term Disability Plan for Salaried Employees,* 914 F.2d 1279, 1286 (9th Cir.1990) ("[I]f Madden's argument were correct, ERISA fiduciaries would be stripped of all administrative discretion, as they would be required to follow the Department of Health and Human Services' decisions regarding social Security benefits, even where the Plan determines benefits under different standards or the medical evidence presented is to the contrary.").

## IV.

Under ERISA, a civil action may be brought by a beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) [of ERISA] is to be reviewed under a *de novo* standard *unless* the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," in which case an abuse of discretion standard applies. The Fifth Circuit has noted that the Supreme Court "surely did not suggest [in *Firestone*] that 'discretionary authority' hinges on incantation of the word 'discretion' or any other 'magic word.' Rather, the Supreme Court directed lower courts to focus on the breadth of the administrators' power—their authority to determine eligibility for benefits or to construe the terms of the plan.'" *Wildbur v. ARCO Chem. Co.,* 974 F.2d 631, 636 (5th Cir.), *modified on other grounds,* 979 F.2d 1013 (5th Cir.1992) (quoting *Block v. Pitney Bowes Inc.,* 952 F.2d 1450, 1453 (D.C.Cir.1992)); *see also Lynd v. Reliance Standard Life Ins. Co.,* 94 F.3d 979, 981 (5th Cir.1996).

Plans which authorize the administrator to make a final benefit determination give the administrator "discretionary authority." *See, e.g., Duhon v. Texaco, Inc.,* 15 F.3d 1302, 1305 (5th Cir.1994) (decisions of plan administrator were "final and conclusive" as to all questions "relating to either the interpretation or administration of th[e] Plan"); *Wildbur,* 974 F.2d at 637 ("independent," "final and conclusive" authority to determine benefit eligibility); *Boyd v. United Mine Workers Health & Retirement Funds,* 873 F.2d 57, 59 (4th Cir.1989) (authority of "full and final determination as to all issues concerning eligibility for benefits" and power "to promulgate rules and regulations to implement th[e] Plan"). If a plan merely grants authority to control and manage the operation and administration of the Plan, the administrator does not have discretionary authority. *Michael Reese Hosp. & Medical Ctr. v. Solo Cup Employee Health Benefit Plan,* 899 F.2d 639, 641 (7th Cir. 1990), *cited in Chevron,* 47 F.3d at 143. "Consequently, district courts in the Fifth Circuit review under an abuse of discretion standard a plan administrator's factual determinations and determinations made pursuant to a plan that gives the administrator discretionary authority to determine eligibility or interpret the terms of the plan." *Sweatman v. Commercial Union Ins. Co.,* 39 F.3d 594, 597 (5th Cir.1994).

In the instant case, the Plan provides the following:

> In carrying out their respective responsibilities under the Plan, the Plan Administrator and other Plan fiduciaries *shall have discretionary authority* to interpret the terms of the Plan and *to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan.* Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

(Defendants' Motion, Instrument No. 22, Exh. 1, at 7) (emphasis added). Given this grant of absolute authority to MetLife, the Court finds that its determination is subject to review under an abuse of discretion standard.

Furthermore, the Court should review MetLife's decision under an abuse of discretion standard because this case involves MetLife's factual determination that Milson was not totally disabled under the terms of the Plan. In *Pierre v. Connecticut Gen. Life. Ins. Co.,* 932 F.2d 1552, 1562 (5th Cir.1991), the Fifth Circuit held that a district court should review factual determinations made by an ERISA plan admin-

istrator or fiduciary for an abuse of discretion. *See also Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Michigan,* 97 F.3d 822, 828 (5th Cir.1996). "[T]hat is, federal courts owe due deference to an administrator's factual conclusions that reflect a reasonable and impartial judgment." *Pierre,* 932 F.2d at 1562. Furthermore, MetLife's conflict of interest as an administrator and a benefit insurer does not change the standard of review. *Sweatman,* 39 F.3d at 599. Rather, "the district court should weigh any potential conflict of interest in its determination of whether the ... administrator abused its discretion." *Id.; see Bellaire Gen. Hosp.,* 97 F.3d at 828 n. 9 ("A conflict of interest does not affect the standard of review, but rather is a factor to be considered in evaluating whether plan administrator abused his discretion.").

"In applying the abuse of discretion standard, [the court] analyze[s] whether the plan administrator [or fiduciary] acted arbitrarily or capriciously." *Salley v. E.I. DuPont de Nemours & Co.,* 966 F.2d 1011, 1013 (5th Cir.1992). This analysis requires the reviewing court "to determine if the decision of the plan fiduciary is 'supported by substantial evidence' and is based on correct interpretations of the law." *Wildbur,* 974 F.2d at 639; *see Sandoval v. Aetna Life and Casualty Ins. Co.,* 967 F.2d 377, 380 n. 4 (10th Cir.1992). " 'Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker].' Substantial evidence requires 'more than a scintilla but less than a preponderance.' " *Sandoval,* 967 F.2d at 382 (quoting *Flint v. Sullivan,* 951 F.2d 264, 266 (10th Cir.1991)). Furthermore, in determining whether the plan administrator's decision is arbitrary and capricious, "a district court should evaluate the administrator's fact findings regarding the eligibility of a claimant based on the evidence before the administrator...." *Wildbur,* 974 F.2d at 639.

**V.**

The Court finds that MetLife's decision to terminate Milson's LTD benefits was supported by substantial evidence and not arbitrary and capricious. As mentioned, the Plan provides that in order for Milson to be considered "totally disabled," she must be completely unable, after the first 36 months of her disability, to engage in any occupation or employment for which she is or becomes qualified. (Defendants' Motion, Instrument No. 22, Exh. 1, at 19–20). On September 10, 1991, Dr. McNeel, Milson's treating physician, reported that Milson was totally disabled. (Defendants' Motion, Instrument No. 22, Exh. 3). Then, on February 25, 1994, Dr. Martin, also Milson's treating physician, documented that Milson's progress remained unchanged, but stated that she could sit, stand, and walk to approximately one (1) hour. Martin further indicated that Milson could occasionally lift up to twenty (20) pounds. (Defendants' Motion, Instrument No. 22, Exh. 6).

Again, in June of 1995, Martin reported that Milson's condition remained unchanged, but noted that Milson could sit for three (3) to four (4) hours, and could stand, walk, bend over, and twist for one (1) to two (2) hours. This time, Martin stated that Milson had the ability to lift or carry up to twenty-five (25) pounds occasionally and recommended that Milson only be permitted to sit up to six (6) hours per day. (Defendants' Motion, Instrument No. 22, Exh. 12).

Later, on February 29, 1996 and after conducting a physical assessment of Milson, Velghe concluded that Milson was able to work in the Sedentary physical capacity level based on her occasional lifting capabilities. (Defendants' Motion, Instrument No. 22, Exh. 14). Velghe reported that Milson could sit five (5) to six (6) hours in sixty (60) minute durations, stand for one (1) hour, and occasionally walk moderate distances for two (2) to three (3) hours. (*Id.*). Appelton then determined that Milson had the skills and ability to

perform in the following sedentary occupations: charge account clerk, telephone solicitor, call out operator, and surveillance system monitor. (Defendants' Motion, Instrument No. 22, Exh. 16). Based on the foregoing, MetLife concluded that Milson was not prohibited from working in any position for which she was qualified.

Given the reports of Milson's treating physicians and Velghe's and Appelton's assessments and recognizing MetLife's dual role as claims administrator and insurer, the Court finds that MetLife did not abuse its discretion in terminating Milson's LTD benefits. MetLife's determination was supported by substantial evidence in the record.

## VI.

■ Milson also argues that MetLife abused its discretion because it failed to give substantial weight to the opinions of her treating physicians, as required by the treating physician rule. (Plaintiffs' Motion, Instrument No. 23, at 27). However, as noted by Milson, in *Salley v. E.I. DuPont de Nemours & Co.*, 966 F.2d 1011, 1016 (5th Cir.1992), the Fifth Circuit stated that it had "considerable doubt about holding the [treating physician] rule applicable in ERISA cases." The Court reasoned that under the rule, "the treating physician would stand to profit greatly if the court were to find benefits should not be terminated. There is a clear and strong conflict of interest, and we are doubtful that a court should defer automatically to his or her testimony." *Id.* Thus, as in *Salley,* this Court declines to extend the treating physician rule to this ERISA case.

■ In addition, Milson argues that MetLife abused its discretion because she was deprived of a "full and fair review" of her claim, as required by ERISA. (Plaintiff's Response, Instrument No. 27, at 8–9). Section 1133(2) of ERISA provides that "every employee benefit plan shall … afford a reasonable opportunity to any participant whose claim for benefits has been

denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." "Other circuits have explained that 'full and fair review means knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of the evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision.'" *Sweatman v. Commercial Union Ins. Co.,* 39 F.3d 594, 598 (5th Cir.1994) (quoting *Sage v. Automation, Inc. Pension Plan & Trust,* 845 F.2d 885, 893–94 (10th Cir.1988) (quotations omitted)). "The word 'review' does not connote examination by a second party. Instead 'review' means 'to view, look at, or look over again.'" Sweatman, 39 F.2d at 598 (quoting the Random House College Dictionary 1130 (Rev. ed.1980)).

Milson merely states that "[i]t appears from the record that the only investigation conducted by MetLife was to establish some method to terminate … [her] benefits." (Plaintiff's Response, Instrument No. 27, at 8). In addition, Milson continues, "[i]t does not appear in any respect that MetLife was looking for [an]y method to continue to approve and pay Milson's claim." (*Id.* at 9). In the absence of any evidence pointing to a procedural deficiency in MetLife's review of her claim, the Court finds that Milson cannot show that MetLife failed to conduct a "full and fair review" of her claim.

## VII.

Accordingly, Defendants' motion for summary judgment is **GRANTED,** (Instrument No. 22), and Milson's motion for summary judgment is **DENIED,** (Instrument No. 23). MetLife's termination of Milson's LTD benefits is upheld.

The Clerk shall enter this Order and provide a copy to all parties.