Revised July 30, 1998

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 97-30764

_____

RICHARD A. THREADGILL, SR.,

Plaintiff-Appellee,

versus

PRUDENTIAL SECURITIES GROUP, INC., ET AL.,

Defendants,

GRAHAM ENERGY SERVICES INC. EXECUTIVE COMPENSATION PLAN;
BRAELOCH HOLDINGS INC. EXECUTIVE COMPENSATION PLAN,

Defendants-Appellants,

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JOSEPH KILCHRIST,

Plaintiff-Appellee,

versus

PRUDENTIAL SECURITIES GROUP, INC., ET AL.,

Defendants,

GRAHAM ENERGY SERVICES INC. EXECUTIVE COMPENSATION PLAN;
BRAELOCH HOLDINGS INC. EXECUTIVE COMPENSATION PLAN,

Defendants-Appellants,

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MICHAEL R. STEWART,

Plaintiff-Appellee,

versus

PRUDENTIAL SECURITIES GROUP, INC., ET AL.,

                                        Defendants,


GRAHAM ENERGY SERVICES INC. EXECUTIVE COMPENSATION PLAN;
BRAELOCH HOLDINGS INC. EXECUTIVE COMPENSATION PLAN,

                                        Defendants-Appellants.

_____

            Appeal from the United States District Court
                 for the Eastern District of Louisiana
_____

                          June 26, 1998

Before DAVIS, WIENER, and PARKER Circuit Judges.

WIENER, Circuit Judge:

     Defendants-Appellants Graham Energy Services Inc. Executive
Compensation Plan and BraeLoch Holdings Inc. Executive
Compensation Plan (collectively, "the Plans") appeal the district
court's grant of partial summary judgment in favor of Plaintiffs-
Appellees Richard Threadgill, Joseph Kilchrist, and Michael
Stewart ("the Beneficiaries") —— all former Graham Energy
Services Inc. ("GESI") employees and participants in its
executive compensation plan —— on the Beneficiaries' claims
against the Plans for "Change of Control" pension benefits.
Concluding that the district court erred in reversing the plan
administrator's decision denying these benefits, we reverse the
district court and reinstate the ruling of the plan
administrator.

FACTS AND PROCEEDINGS

BraeLoch Holdings Inc. ("BraeLoch") and affiliated companies worked with Prudential Bache Energy Production Co. ("Prudential-Bache") in managing oil and gas limited partnerships and selling interests in them as investments to Prudential-Bache's customers. GESI, a Louisiana corporation, was a wholly-owned subsidiary of BraeLoch. On May 7, 1993, BraeLoch and Prudential-Bache agreed to sell all of the partnership interests to Parker and Parsley Acquisition Co. ("Parker"). The transaction was memorialized in an Agreement and Plan of Merger, under which Parker agreed to merge with the partnerships. The obligation to merge was expressly contingent on, <u>inter</u> <u>alia</u>, the success of a tender offer to be made by Parker to the partnerships' limited partners: If the tender offer failed to achieve its stated goals, the prospective merger partners would not be obligated to merge. Although the partnerships were clients of GESI, neither GESI nor BraeLoch was a party to the Agreement and Plan of Merger.

BraeLoch was a party, however, to another contemporaneously executed contract, the Stock Purchase Agreement, in which BraeLoch Successor Corp. ("Successor Corp.") contracted with BraeLoch and a Prudential-Bache affiliate —— Prudential Securities Inc.[1] —— to purchase all capital stock in BraeLoch.

---

[1]According to the Plans' brief, Prudential Securities Inc. was involved in the transaction. Under the terms of the Stock

According to the Beneficiaries, Successor Corp. was a Prudential-Bache shell corporation, and the two May 7 contracts — the Agreement and Plan of Merger and the Stock Purchase Agreement — were entered into simultaneously for the purpose of liquidating Prudential-Bache's oil and gas investment business and the BraeLoch companies as well.

The Beneficiaries were executive employees of BraeLoch's Louisiana subsidiary, GESI.  As GESI officers, they participated in the Graham Energy Services Inc. Executive Compensation Plan ("the GESI Plan"), which provided, inter alia, "Change of Control" benefits.  The GESI Plan defined Change of Control, in pertinent part, as follows:

> A Change of Control shall be deemed to have occurred upon the earlier of:
>
> (a)  the dissolution, liquidation, winding up the affairs of [BraeLoch] or the sale or transfer of all, or substantially all, of the assets of BraeLoch; provided, however, no such events shall be deemed to occur (i) in the event of an insolvency or bankruptcy of BraeLoch or (ii) in the event of the transfer of assets of BraeLoch to an affiliate of BraeLoch provided such affiliate assumes the obligations of the Plan and agrees to continue uninterrupted the rights of Participants under the Plan[.]

The GESI Plan vested BraeLoch's Board of Directors with the

Purchase Agreement itself, however, Prudential Securities Inc. is not a party to the contract.  We accept the Plans' representation at face value inasmuch as the Prudential-Bache affiliate's role in the transaction is not a matter of contention between the parties.

4

absolute right to amend the Plans at any time prior to the occurrence of a Change of Control:

> The Board of Directors shall have the right, in its absolute discretion, at any time and from time to time, to modify or amend, in whole or in part, any or all of the provisions of this Plan, or suspend or terminate it entirely; provided that no such modification, amendment, suspension or termination may reduce the amount of benefits or adversely affect the manner of payment of benefits of (1) any Participant or Beneficiary then receiving benefits in accordance with the terms of Article III or (2) any Participant or Beneficiary entitled to benefits as a result of the occurrence of a Change of Control as described in Article IV prior to or concurrent with a termination of the Plan. The provisions of this Article V shall survive a termination of the Plan unless such termination is agreed to by the Participants.

On May 20, less than two weeks after the two agreements were signed, BraeLoch's Board convened and formally adopted a resolution to amend the GESI Plan to eliminate the Change of Control benefit. The Board also adopted a resolution to transfer participants in the GESI Plan to the BraeLoch Plan, which was itself amended to (a) eliminate its own Change of Control benefits provision and (b) replace it with an annuity benefit. Formal plan amendments were executed on June 10 (GESI Plan) and June 14 (BraeLoch Plan). The amendment to the GESI Plan provided, in pertinent part:

> Article IV of the [GESI] Plan is hereby deleted in its entirety and shall have no application or effect with respect to the Plan, Graham Energy Services Inc. Executive Compensation Trust No. 1 ("Trust No. 1") or

5

the Participants.  There have not been and there shall be no consequences of a Change of Control.  Specifically, but not by way of limitation, the transfer of voting shares of [BraeLoch] to [Successor Corp.], a Delaware Corporation, and any transactions in connection with such sale shall not result in any benefits under Article IV as in effect prior to its deletion hereby.  All references to Article in the Plan and in Trust No. 1 are hereby deleted and any consequences related to Article IV of the Plan shall not result or be applicable.

* * *

All participants in the Plan as of the date hereof have become participants in the BraeLoch Plan.  As provided in Section 2.1(c) of the Plan, each such Participant shall no longer be a participant in the Plan.  Instead, such Participant shall be a Participant in the BraeLoch Plan and all benefits to such Participants shall be paid solely from the BraeLoch Plan.

At a time in May, subsequent to the execution of the two May 7 contracts, the Beneficiaries signed an enhanced severance separation agreement which provided each of them with specified benefits in the event his employment should terminate after the sale of BraeLoch to Successor Corp. was complete.  This severance agreement contained an express release by the Beneficiaries of all claims against, inter alia, GESI and its corporate affiliates.  Subsequently, each of the Beneficiaries accepted the annuity benefit established in the same amendment that had eliminated the Plans' Change of Control benefits.  Two of the Beneficiaries — Kilchrist and Stewart — signed additional instruments in which they expressly consented to that plan

6

amendment.

On June 24, BraeLoch, Successor Corp., and Prudential Securities Inc.[2] executed an Amended and Restated Stock Purchase Agreement. That same day, Successor Corp. purchased BraeLoch's stock, closing the transaction contemplated in the Stock Purchase Agreement as thus amended and restated.

In July, the tender offer required by the other May 7 contract, the Agreement and Plan of Merger, achieved its goal. Subsequent to satisfaction of that prerequisite, Parker merged with the oil and gas partnerships (not with either BraeLoch or GESI). Each of the Beneficiaries' employment with GESI had terminated prior to the Parker merger with the partnerships: Threadgill's on August 31; Kilchrist's and Stewart's on September 30. Each received all benefits provided for in his separation agreement, as well as his annuity under the BraeLoch Plan.

Nevertheless, in May of the following year, Threadgill filed suit in state court against Prudential, First National Bank of Commerce, BraeLoch, and Successor Corp., seeking the Change of Control benefits once contained in the Plans but deleted by the board resolution of the previous May. Stewart and Kilchrist filed similar lawsuits. The defendants removed Threadgill's case to federal court and filed a motion to dismiss his action on the

---

[2]Under the terms of the Amended and Restated Stock Purchase Agreement itself, Prudential Securities Inc. was not a party to the contract. See id.

grounds that (1) the corporate defendants were not proper parties to the suit as it sought benefits under an ERISA plan, and (2) Threadgill had failed to exhaust the administrative remedies expressly provided in the Plans. Because Kilchrist's and Stewart's claims were substantially identical to Threadgill's, the parties voluntarily consolidated the cases, agreeing that the outcome of the motion to dismiss in the Threadgill suit would be controlling in the Stewart and Kilchrist actions.

The district court granted the defendants' dismissal motion, so the Beneficiaries filed administrative claims for Change of Control benefits with the plan administrator of the Plans. The Beneficiaries contended that, by virtue of the May 7 contracts,[3] they were entitled to Change of Control benefits notwithstanding (1) the May 20 amendment deleting those benefits and (2) their own execution of the enhanced severance separation agreements ——

_____

[3]Although the Beneficiaries now characterize their administrative claim as having been predicated on both contracts causing their benefits to vest under each of the Change of Control definitions at issue —— the asset transfer provision and the "liquidation, dissolution, winding up" language —— the Beneficiaries relied solely on the Agreement and Plan of Merger as having initiated a Change of Control exclusively under the GESI Plan's asset-transfer definition. We consider all the permutations now offered by the Beneficiaries, however, because (a) the plan administrator did consider, albeit summarily, the possibility of a Change of Control having occurred by virtue of the "liquidation, dissolution, winding up" of BraeLoch, and (b) the Beneficiaries submitted the Stock Purchase Agreement as part of the administrative record for the plan administrator's consideration, and they referred to it in their claim (albeit without ever explicitly relying on it in support of their position).

and, in the cases of Kilchrist and Stewart, their express written releases and consents to the amendment. According to the Beneficiaries, the execution of the merger and stock purchase agreements constituted a Change of Control, causing the Beneficiaries' Change of Control benefits to vest prior to May 20. As such, they insist, the amendment violated ERISA's anticutback provisions,[4] precluding the denial of Change of Control benefits on the basis of the May 20 resolutions and the implementing plan amendments of June 10 and 14, respectively.

After taking the Beneficiaries' claims under submission, the plan administrator determined that no Change of Control could have occurred vis à vis the GESI Plan's "dissolution,

---

[4]See 29 U.S.C. § 1054(g) (1994). As we conclude that the Change of Control benefits never vested, we need not devote our attention to the Plans' alternative argument that, even if the benefits had accrued, the May 20 amendment is not subject to anticutback scrutiny as the Plans are "top hat" plans. See Miller v. Eichleay Eng'q Inc., 886 F.2d 30, 34 n.8 (3d Cir. 1989) ("A top hat plan is 'a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly trained employees.'")(citing 29 U.S.C. §§ 1051(2), 1081(a)(3), and 1101(a)(1) (1994)); Spacek v. Maritime Ass'n, 134 F.3d 283, 295 (5th Cir. 1998) ("ERISA exempts top-hat plans from the fiduciary, funding, participation and vesting requirements applicable to other employee benefit plans.") (quoting Duggan v. Hobbs, 99 F.3d 307, 310 (9th Cir. 1996)). We note in passing, however, that, had resolution of the issue been necessary, we would likely have held in favor of the Plans. In so noting, though, we are mindful that, even though "no statutory mechanism exists to safeguard the expectations of top hat plan participants in obtaining their deferred compensation," Spacek, 134 F.3d at 296, such participants are not without non-statutory protections. See id. at 295-297.

9

liquidation, winding up" provision, and that, as a result, "the question [could] be refined to: 'Did a sale or other transfer of all, or substantially all, of the assets of BraeLoch (to a non-affiliate) occur prior to May 20, 1993?'" Answering in the negative, the plan administrator determined that: (1) the Agreement and Plan of Merger could not have triggered a Change of Control because it did not involve or result in the sale or transfer of all or substantially all of BraeLoch's assets, and (2) even if it had, the merger contemplated by that agreement remained conditioned on the success of Parker's tender offers to the partners of the oil and gas partnerships. Consequently, reasoned the plan administrator, there could not have been a Change of Control prior to the July expiration date of the tender offers. The Beneficiaries appealed the denial of their claims and the plan administrator affirmed his decision.

The Beneficiaries then filed an amended complaint in the district court, naming the Plans as defendants. The Plans moved for summary judgment on the ground that the plan administrator had not abused his discretion. Even though the plan administrator framed the Change of Control issue in terms of whether the Agreement and Plan of Merger constituted an asset transfer, the district court focused on the "liquidation, dissolution, winding up" definition of Change of Control;[5] more

_____

[5]The plan administrator's concentration on the asset-transfer Change of Control definition and summary treatment of

10

particularly, and within that paradigm, solely on "winding up":

> The plan administrator based his finding that
> the May 7th Agreement and Plan of Merger did
> not create a "Change of Control" within the
> meaning of the Plans on the fact that even
> though the May 7th Agreement obligated
> BraeLoch to commence "winding up" the affairs
> of the company, the Agreement was contingent
> since it contained provisions for termination
> of the agreement prior to closing under
> certain conditions.

Having so characterized the issue, the district court went on to deny the Plans' motion, finding that

> [t]he Agreement and Plan of Merger was
> binding and enforceable as of May 7, 1993,
> obligated BraeLoch to commence "winding up"
> the affairs of the company, to terminate all
> its corporate relationships with third
> parties, to sell its oil and gas partnership
> interests, to consummate the merger, and
> required the Board and executive officers to
> resign.

Following the district court's denial of the Plans' motion, the Beneficiaries filed a motion for partial summary judgment on the issue of the Plans' liability for Change of Control benefits. The district court granted the Beneficiaries' motion and the Plans timely appealed.

## II

---

the issue under the GESI Plan's "dissolution, liquidation, winding up" provision are not surprising given the fact that the Beneficiaries relied exclusively on the former definition in advancing their administrative claim that a Change of Control had occurred prior to May 20. The plan administrator's oblique reference to a Change of Control under the latter definition may very well have provided the impetus for the "winding up" analysis urged by the Beneficiaries for the first time in the district court.

11

ANALYSIS

A.    Standard of Review

We review grants of summary judgment <u>de</u> <u>novo</u>, applying the same standards as the district court.[6]  When the terms of a benefit plan governed by ERISA give the plan administrator discretionary authority to determine eligibility for benefits —— which grant of discretion is undisputed by the Beneficiaries as to the plan administrator of the ERISA plans at issue in the instant case —— the district court reviews the plan administrator's denial of benefits for abuse of discretion.[7]  On appeal, we review <u>de</u> <u>novo</u> the district court's holding on the question whether the plan administrator abused its discretion.[8]  We will not, however, set aside the district court's factual findings underlying its review of the plan administrator's determination unless those findings are clearly erroneous.[9]

---

[6]<u>Melton v. Teachers Ins. & Annuity Ass'n of America</u>, 114 F.3d 557, 559 (5th Cir. 1997).

[7]<u>Barhan v. Ry-Ron Inc.</u>, 121 F.3d 198, 201 (5th Cir. 1997) (citing <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115, 109 S.Ct 948, 956-57, 103 L.Ed.2d 80 (1989)).

[8]<u>Id.</u> at 200.

[9]<u>Bellaire Gen'l Hosp. v. Blue Cross Blue Shield of Michigan</u>, 97 F.3d 822, 829 (5th Cir. 1996).

B.   Plan Interpretation

Eligibility for benefits under any ERISA plan is governed in the first instance by the plain meaning of the plan language.[10] In  Wildbur v. ARCO Chemical Co.,[11] we set forth the generally applicable[12] methodology for reviewing a plan administrator's denial of benefits:

> First, a court must determine the legally correct interpretation of the plan.  If the administrator did not give the plan the legally correct interpretation, the court must then determine whether the administrator's decision was an abuse of discretion. . . .  In answering the first question, i.e., whether the administrator's interpretation of the plan was legally correct, a court must consider:
>
> > (1)  whether the administrator has given the plan a uniform construction,
> > (2)  whether the interpretation is consistent with a fair reading of the plan, and
> > (3)  any unanticipated costs resulting from different

---

[10]Nickel v. Estate of Estes, 122 F.3d 294, 298 (5th Cir. 1997).

[11]974 F.2d 631 (5th Cir. 1992).

[12]Although we routinely employ this two-step approach in testing de novo a plan administrator's interpretation of a plan for abuse of discretion, rigid adherence to the Wildbur method is not always necessary.  See Duhon v. Texaco, Inc., 15 F.3d 1302, 1307-08 & n.3 (5th Cir. 1994) (noting that "the reviewing court is not rigidly confined to [Wildbur's] two-step analysis in every case," and departing from the methodology in concluding that the plan administrator did not abuse his discretion).  It is, however, generally instructive and appropriate to the analysis in the instant case.

>           interpretations of the
>           plan.
>
>           If a court concludes that the
>      administrator's interpretation is incorrect,
>      the court must then determine whether the
>      administrator abused his discretion.  Three
>      factors are important in this analysis:
>
>           (1)  the internal consistency
>                of the plan under the
>                administrator's
>                interpretation,
>           (2)  any relevant regulations
>                formulated by the
>                appropriate
>                administrative agencies,
>                and
>           (3)  the factual background of
>                the determination and any
>                inferences of lack of
>                good faith.[13]

"Only if the court determines that the administrator did not give

the plan the legally incorrect interpretation, must the court

then determine whether the administrator's decision was an abuse

of discretion."[14]

C.  De Novo Review

     The Plans argue that the district court misapplied Wildbur

— reversing the sequence of its analysis of legal correctness

and abuse of discretion — and insist that the plan

administrator's decision was neither legally incorrect nor an

abuse of discretion.  We proceed with our own de novo Wildbur

---

[13]Wildbur, 974 F.2d at 637-38 (citations omitted).

[14]Tolson v. Avondale Industries, Inc., — F.3d —, 1998
WL 247954 at *4 (5th Cir. 1998)

14

review of each of the grounds put forth by the Beneficiaries to support a Change of Control finding.

1.  "DISSOLUTION, LIQUIDATION, WINDING UP"

a.  <u>The Agreement and Plan of Merger</u>

The plan administrator summarily disposed of the possibility that the Agreement and Plan of Merger effected a Change of Control by causing the "dissolution, liquidation, winding up the affairs" of BraeLoch.  In contrast, the district court concentrated on this definition of Change of Control —— or, more precisely, just on "winding up" —— in overturning the administrative decision.  The  court found that the Agreement and Plan of Merger obligated BraeLoch to commence the <u>process</u> of "winding up" its affairs.  Reasoning that this perceived winding-up process caused the Change of Control benefits to vest prior to the BraeLoch directors' May 20 amendment of The Plans, the court concluded that the plan administrator abused his discretion in denying the Beneficiaries' claims.

The Plans contest the district court's interpretation, arguing that there is no evidence in the administrative record that a "winding up" of BraeLoch's affairs occurred, or was even required to commence, prior to May 20 —— not, at least, within the universally accepted meaning of "winding up" in the context of business corporation law.  In other words, there is no evidence that BraeLoch (1) liquidated its assets or distributed them in-kind to its shareholders, (2) otherwise disposed of its

15

property, (3) ceased conducting its day-to-day business, or (4) took the legally required steps to dissolve the corporation. In an effort to support the district court, the Beneficiaries counter that the Agreement and Plan of Merger caused the de facto termination and liquidation of BraeLoch because BraeLoch's sole business was managing the oil and gas partnerships acquired by Parker pursuant to the agreement.

The Plans respond by noting that, even though the service company's loss of the oil and gas partnership interests was tantamount to the loss of a substantial client, a corporation is not "dissolved," "liquidated," or "wound up" solely because it loses a major segment of its business: Such corporate sea changes can only be effectuated by formal corporate action; there is no such thing as a de facto liquidation. In (a) isolating the term "winding up" and viewing it in a vacuum and (b) finding that, alone, "winding up" somehow contemplates a "process" the commencement of which sufficed to cause benefits to vest under the GESI Plan's conjunctive "dissolution, liquidation, winding up" definition of Change of Control, the district court failed to appreciate that (1) the formal corporate event denoted by this tri-partite term of art occurs only at the time when the corporation acts formally, pursuant to the appropriate statutes of its state of incorporation, to dissolve itself; and, (2) as a matter of corporate law, a merger between business entities does not necessarily constitute or result in a formal dissolution,

16

liquidation, and winding up of the merged corporation.[15]

In further support of the plan administrator's interpretation, the Plans observe that the district court's whole-cloth creation of this "winding-up process" analysis is not only contrary to established corporate law, but is also contrary to the plain language of the GESI Plan which clearly defines a Change of Control in terms of a _fait_ _accompli_, an event that _has_ _occurred_: Under any fair reading of the GESI Plan, a Change of Control must actually take place —— not merely be contemplated in the future —— for the benefits to vest. As the Agreement and Plan of Merger contained several conditions precedent or contingencies, any one of which, if unmet, would have precluded occurrence of the merger, the mere signing of that agreement would not have been sufficient, in and of itself, to trigger a Change of Control.[16]

---

[15]See _Rauch v. RCA Corp._, 861 F.2d 29 (2d Cir. 1988) _and_ _Rothschild Internat'l Corp. v. Liggett Group Inc._, 474 A.2d 133 (Del. 1984) (holding that owners of preferred stock were not entitled to the liquidation or redemption preference specified in their stock agreements because the merger of the corporations in which they owned stock did not constitute the liquidation of the corporation). In fact, virtually every business corporation law in this country contemplates, in sequence, (1) the formal adoption of a corporate resolution to commence liquidation, _followed_ _by_ (2) the sale or distribution in-kind of its assets, the payment if its debts, and the gradual reduction and eventual termination of its routine operations, and _concluding_ _with_ (3) the issuance of a final certificate of dissolution by the designated state officer, e.g., the Secretary of State. _See,_ _e.g._, LA. REV. STAT. ANN. §§ 12:141-12:149 (West 1994).

[16]The Beneficiaries rely on articles 1767 and 1775 of Louisiana's Civil Code for the proposition that the legal effects

17

We agree completely with the Plans' interpretation of the meaning of Change of Control as embodied in the "dissolution, liquidation, winding up" language of the GESI Plan. The district court misapprehended the widely-understood meaning of that cohesive, tri-partite phrase and impermissibly parsed it by carving out "winding up" and focusing on the dictionary meaning of only that one of the three inextricably intertwined terms of the phrase. And, in so doing, the district court ignored the legal correctness factors outlined in Wildbur, offering no explanation as to how the plan administrator's interpretation: (1) was inconsistent with a fair reading of the plan, (2) conflicted with previous constructions, if any, of the Change of Control provision (disturbing the uniformity of plan

of the June 1993 closing of the Agreement and Plan of Merger are retroactive to the contract's date of inception — May 7, 1993. LA. CIV. CODE ANN. arts. 1767, 1775 (West 1987). The Plans respond that Louisiana law — particularly the Civil Code — is inapplicable to the Change of Control determination inasmuch as (1) the plan language alone is determinative and (2) to the extent Louisiana law "relates to" the plan, it is preempted by ERISA." See 29 U.S.C. § 1144(a) (1994). We need not reach this issue, though, as we are not convinced in the first instance that the plan administrator reached an incorrect legal interpretation, much less abused his discretion, in determining that the Agreement and Plan of Merger did not implicate the "dissolution, liquidation, winding up" Change of Control provision. Moreover, the applicable reference for these questions of Louisiana corporate law is not the Civil Code but Title 12 of the Louisiana Revised Statutes, La. Rev. Stat. Ann. §§ 12:1-12:178 (West 1994). Known in Louisiana as the Business Corporation Law, this portion of Title 12 makes it pellucid that "dissolution, liquidation, winding up" does not even commence, as a matter of law, until formal corporate resolutions are adopted, appointing a liquidator, with duly certified copies filed, inter alia, in the office of the Secretary of State.

18

construction) or (3) resulted in costs unanticipated by the plan.

Of these considerations, we find most significant the court's failure to explain how: (1) an interpretation diverging from well-settled business corporation principles is consistent with a fair reading of the plan, or (2) BraeLoch could have anticipated, as a foreseeable cost, the necessity of funding Change of Control benefits for plan participants who accept annuity and severance benefits as alternate forms of compensation, given (a) the consensual nature of the transaction described in the Agreement and Plan of Merger, and (b) the broad amendment power vested in BraeLoch's board of directors under the GESI Plan.

Moreover, even assuming arguendo that the plan administrator's implicit conclusion was not legally correct,[17] and thus failed the first step of Wildbur, the district court still erred in overturning the plan administrator's decision, as it did so without taking into account the deference afforded administrative decisions under the second step of Wildbur review. The district court substituted its own judgment for that of the plan administrator's without considering: (1) the internal

---

[17]As noted earlier, the plan administrator did not examine the possibility that the Agreement and Plan of Merger effected a "dissolution, liquidation, winding up" of the affairs of BraeLoch, having conclusionally determined that the language was inapplicable.  See supra note 5 and accompanying text.

19

consistency of the plan under the administrator's interpretation; (2) administrative regulations, if any, dictating a different interpretation; or (3) whether the facts and the sequence of occurrences support the administrator's conclusion. Indeed, with regard to the third factor, the district court opened the door to an unintended and illogical vesting explanation. The widely-accepted purposes for including Change of Control benefits in employee benefit plans —— to (1) fend off hostile takeovers and (2) assure key employees that they will be fairly compensated in the event of a hostile takeover by depriving corporate raiders of the power to prevent such payment —— could not have been furthered by recognizing the accrual of Change of Control benefits.[18] The Agreement and Plan of Merger embodied a consensual business transaction, and the Beneficiaries accepted the annuity benefit which was duly substituted for the Change of Control benefits once a friendly merger partner was located and the risk of hostile takeover avoided.[19]

---

[18]See Allen v. Westpoint-Pepperel, Inc., 1996 WL 2004 at *5 (S.D.N.Y. 1996) ("[T]here are two principal purposes (other than deterring potential raiders) for putting a 'Change in Control' provision in an employee benefit plan. The first is to assure employees that they will be paid in the event of a takeover by depriving a raider of the power to prevent payment. The second is to insure that key employees will be able to focus on their jobs during the hectic period associated with a potential takeover, rather than having to worry about how they will pay their bills if they lose their jobs.").

[19]In addition to its inappropriate "winding up" analysis, the district court erred as a matter of law when it based its abuse of discretion finding on the facts that (1) BraeLoch's top

b.   The Stock Purchase Agreement

The Beneficiaries also contend that the other May 7 contract, the Stock Purchase Agreement, evidences that a Change of Control was triggered under the GESI Plan's "dissolution, liquidation, winding up" provision.[20]  The Beneficiaries maintain that the Stock Purchase Agreement required that: (1) BraeLoch shareholders sell all of their stock to Successor Corp. (purportedly a Prudential shell company), and (2) BraeLoch be operated under the control of Successor Corp. pending closing, at which time all BraeLoch officers and directors were to resign.

The Plans challenge, as unsubstantiated, the Beneficiaries' claims that Successor Corp. would control BraeLoch pending the sale and that BraeLoch shareholders could not avoid the obligation to close the transaction.  The Plans also argue that, as with a merger, a transfer of stock ownership does not constitute the "dissolution, liquidation, winding up" of a

three officers were replaced by executives from the acquiring company after the Agreement and Plan of Merger was executed, and (2) the agreement prohibited BraeLoch's Board from taking any unusual corporate action.  We agree with the Plans' legal contentions that a change in management is not an act of dissolution and that the obligation to refrain from any unusual corporate activity is essentially one of maintaining the business-as-usual status quo and, as such, is antithetical to any winding-up.

[20]The district court did not address the possibility that the Stock Purchase Agreement effected a "dissolution, liquidation, winding up" of BraeLoch, but this does not preclude our consideration of the issue, as we review de novo the district court's holding on the question whether the plan administrator abused his discretion.

corporation.[21]  Even if we were to assume without granting that

the Beneficiaries offer a legally correct interpretation of the

GESI Plan language in relation to the Stock Purchase Agreement,

we would remain unpersuaded that the plan administrator abused

his discretion in disregarding this proffered "dissolution,

liquidation, winding up" evidence.  As with the Agreement and

Plan of Merger, we discern no Change of Control in the execution

of the Stock Purchase Agreement on May 7, 1993; neither do we see

such a change when we view the two May 7 contracts in pari

materiae.

2.    "SALE OR TRANSFER OF ALL, OR SUBSTANTIALLY ALL, OF THE
      ASSETS OF BRAELOCH"

The Beneficiaries also re-urge the position that they took

in the administrative proceedings; i.e., that BraeLoch's

execution of the Agreement and Plan of Merger effected the

transfer of substantially all of its assets, thereby triggering a

Change of Control.[22]  As previously noted, the plan administrator

---

[21]See In re Traung's Estate, 185 P.2d 801, 803 (Cal. 1947)
(refusing to find liquidation by sale of corporate stock when
"[t]he contract of sale did not require nor contemplate the
liquidation or dissolution of the corporation," but rather
"provided for the sale of all of its capital stock, and not the
transfer of the corporate assets," and noting that "even the sale
of all of the property of a corporation does not work a
dissolution or liquidation of it").  As in the contract
considered in Traung's Estate, the Stock Purchase Agreement did
not contemplate liquidation or dissolution, but, to the contrary,
obligated BraeLoch to continue as a going concern.

[22]Although the Beneficiaries do not appear to offer the
Stock Purchase Agreement as having likewise initiated a Change of
Control under this definition, to the extent that their arguments

rejected this argument, determining that (1) the subject agreement did not involve or result in the sale or transfer of substantially all of the assets of BraeLoch, and (2) even assuming that it produced such a transfer, the agreement could not have done so effectively prior to the July expiration of Parker's tender offers to the partnerships' partners. The plan administrator based his conclusion that no such transfer had occurred by virtue of entering into the Agreement and Plan of Merger on the facts that (1) all of the assets involved in the merger were at all relevant times owned by the partnerships, not by BraeLoch, and (2) BraeLoch's financial statements confirm that it had not been divested of its assets as a result of the merger.

The Beneficiaries observe that the financial statements on which the plan administrator relied do not reflect the operating value of BraeLoch's assets, which value reveals that the loss of the partnership interests effectively shut down BraeLoch's business, given that those interests were the source of the bulk of the company's income and cash flow. The Plans respond by pointing out that appraising the company's assets in terms of their "operating value" has nothing to do with the analysis and misinterprets the plan language, which defines Change of Control simply in terms of BraeLoch's assets vel non, without reference

on appeal can be read as urging error on this ground, we do not believe that the plan administrator abused his discretion in implicitly concluding that the Stock Purchase Agreement did not constitute an asset transfer.

23

to the "operating values" or "income and cash flow" of those assets.

We agree with the Plans on this point as well. More importantly, in proffering this contention the Beneficiaries either totally miss the point or intentionally obfuscate it: The question is not whether they are "right" and the plan administrator is "wrong" but solely whether, in reaching a putatively wrong result, the plan administrator abused his discretion, a test that is easy for the administrator to pass, given that it is a much more deferential standard of review than de novo or even clearly erroneous. In sum, we see no abuse of discretion in the plan administrator's interpretation of the Agreement and Plan of Merger vis à vis the GESI Plan's asset-transfer Change of Control language.

3. MISCELLANEOUS FACTS

The Beneficiaries claim that the plan administrator further abused his discretion by ignoring the minutes of BraeLoch's May 20 Board of Directors meeting. They aver that the minutes reveal the Board's determination that a Change of Control and "winding up" had already occurred. In like manner, they also insist that BraeLoch's funding of Ford Graham's Retirement Trust pension plan — which contained a Change of Control provision identical to the one at issue in the GESI Plan — constitutes an admission that a Change of Control took place. The Plans deflate this assignment by showing that the Ford Graham payments — which began in March

24

of 1992, over a year before the first two agreements were executed on May 7, 1993 — were not contingent on a Change of Control and that the Beneficiaries' allegations with regard to the Graham trust are without evidentiary support.[23]

Finally, the Beneficiaries characterize correspondences leading up to and following the May 7 agreements as "clear and direct evidence" that these agreements initiated a "winding up" of BraeLoch. The Plans attack the competency of this evidence, arguing that it indicates "nothing more than the writers' contemplation of a possibility that at some indeterminate point in the future, various corporations would wind up."

Again, the issue is not the accuracy of the plan administrator's determination, but whether he abused his discretion in making it. Besides concluding that the plan administrator's decisions were legally correct, however, we also perceive no abuse of discretion in the method he employed in reaching his conclusions with respect to these subsidiary grounds

---

[23]The plan administrator dismissed consideration of the Ford Graham payment as irrelevant to a Change of Control determination, finding that

> Ford Graham was being paid under a Retirement Continuation Agreement in effect since March 1992. It was not an ERISA plan and could not be amended without express approval, in writing by both parties. The contract was bought out at the express request of the acquirer of [BraeLoch]. The Plan Administrator found no evidence that the Company declared a change of control in connection with this settlement of a contract liability[.]

advanced by the Beneficiaries as supporting a Change of Control finding.

III

CONCLUSION[24]

Having carefully reviewed the appellate record in this case and the legal arguments advanced by counsel in their appellate briefs and at oral argument, we are satisfied that the positions taken by the Beneficiaries mischaracterize ordinary if sophisticated merger and acquisition contracts — clearly, agreements to do future things — as having prematurely triggered a "Change of Control." These same arguments appear to have influenced the district court to set up the "winding up" straw man and then knock it down, in disregard of clearly established corporate law and rules of interpretation, and likewise in disregard (or at least misapplication) of the jurisprudential road map that we have drawn for courts of this circuit to follow when testing for an ERISA plan administrator's abuse of the broad discretion vested in him by the plan documents. In our de novo review, we conclude that the plan administrator not only reached

---

[24]As we have decided the Plans' appeal in their favor on the issue of the district court's erroneous review of the plan administrator's decision, we need no reach the Plans' alternative arguments that the district court erred by: (1) considering evidence outside the administrative record, and (2) failing to apply the principles of ratification and release — which principles are implicated by the Beneficiaries' acceptance of the annuity benefit and the enhanced separation agreement — to bar the Beneficiaries' claims.

the correct legal conclusion, which ⸺ under the first step of the Wildbur test ⸺ should end court review; he also exercised his discretion without abusing it, thereby satisfying the second step of the Wildbur rubric as well.  Consequently, the summary judgment ruling of the district court is reversed and judgment is hereby rendered in favor of the Plans, dismissing the Beneficiaries' claims for Change of Control benefits, at their cost.

REVERSED and RENDERED at Appellees' cost.