IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-20056
_____

VENCOR HOSPITAL-HOUSTON,

Plaintiff-Appellant,

versus

SEAFARERS WELFARE PLAN,

Defendant-Appellee.

_____

Appeal from the United States District Court for
the Southern District of Texas
(USDC No. H-96-CV-3765)
_____

December 4, 2000

Before REAVLEY, BENAVIDES and DENNIS, Circuit Judges.

REAVLEY, Circuit Judge:[*]

Vencor Hospital-Houston (Vencor) appeals the district court's summary judgment

in favor of Seafarers Welfare Plan (Seafarers). Vencor had sued Seafarers to recover

payment for the hospital care of Jack Lakwyk, a patient at Vencor who died after

---

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should
not be published and is not precedent except under the limited circumstances set forth in
5TH CIR. R. 47.5.4.

spending several months at Vencor's facility, an acute care hospital. In an earlier appeal we remanded this case to the district court for reconsideration in light of our decision in Vega v. National Life Ins. Servs., Inc., 188 F.3d 287 (5th Cir. 1999) (en banc). After remand, the district court again granted summary judgment for Seafarers. Seeing no reversible error in this second appeal, we affirm.

We review de novo the district court's grant of summary judgment, employing the same standards as the district court. See Threadgill v. Prudential Securities Group, Inc., 145 F.3d 286, 292 (5th Cir. 1998). The parties do not dispute the district court's conclusion that the health insurance plan offered by Seafarers was an employee benefit plan subject to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1461. Seafarers was the plan administrator and was vested with discretionary authority to determine eligibility for benefits and construe the terms of the plan. In such circumstances the district court generally reviews the plan administrator's denial of benefits for abuse of discretion. See Threadgill, 145 F.3d at 292.

More specifically, where the administrator has discretionary authority, the administrator's interpretation of the terms of the plan is reviewed for abuse of discretion. See Rhorer v. Raytheon Eng'rs & Constructors, Inc., 181 F.3d 634, 639 (5th Cir. 1999); Matassarin v. Lynch, 174 F.3d 549, 563 (5th Cir. 1999), cert. denied, 120 S. Ct. 934 (2000). The administrator's factual determinations relating to plan benefits are reviewed under the abuse of discretion standard as well. See Sweatman v. Commercial Union Ins. Co., 39 F.3d 594, 597-98 (5th Cir. 1994); Pierre v. Connecticut Gen. Life Ins. Co., 932

2

F.2d 1552, 1562 (5th Cir. 1991). Under the abuse of discretion standard, "federal courts owe due deference to an administrator's factual conclusions that reflect a reasonable and impartial judgment." Id. "In applying the abuse of discretion standard, we analyze whether the plan administrator acted arbitrarily or capriciously." Dowden v. Blue Cross & Blue Shield of Texas, Inc., 126 F.3d 641, 644 (5th Cir. 1997); see also Sweatman, 39 F.3d at 601 (quoting Salley v. E.I. DuPont de Nemours & Co., 966 F.2d 1011, 1014 (5th Cir. 1992)). We have stated that "[a]n arbitrary decision is one made without a rational connection between the known facts and the decision or between the found facts and the evidence." Dowden, 126 F.3d at 644 (quoting Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Michigan, 97 F.3d 822, 828 (5th Cir. 1996)).

Where the administrator operates under a conflict of interest, that conflict does not alter the standard of review, but is a factor to be considered in deciding whether the plan administrator abused its discretion. See Vega, 188 F.3d at 297. The district court recognized this law and applied the correct standard of review in granting summary judgment. It concluded that there was no conflict of interest or demonstrated lack of good faith "that would warrant reducing the deference the court should accord to the Plan administrator's decision." Vencor does not persuade us that the district court erred in concluding that there was no conflict of interest. The record indicates that the plan is a Taft-Hartley Trust, not an insurance company, and that it is a nonprofit, self-insured plan, whose trustees consist of an equal number of management and employees who are not covered by the plan.

For our purposes, the principal holding in Vega is that the record to be considered by the district court is generally confined to the administrative record available to the plan administrator. We held that "the court may not consider evidence that is not part of the administrative record." Id. at 300. The district court in the pending case, on remand, concluded that in light of the documents Vencor provided to Seafarers, the plan did not abuse its discretion in denying coverage on grounds that the care the hospital provided for the period in issue was custodial care. Accordingly the district court again entered summary judgment.

We see no error in the district court's judgment. As in Vega, the hospital in the pending case submitted to the district court additional evidence, such as the affidavit of Dr. Teague and deposition testimony, in support of its claim, but we held in Vega that such evidence should not be considered. We held that "evidence may not be admitted in the district court that is not in the administrative record when that evidence is offered to allow the district court to resolve a disputed issue of material fact regarding the claim—i.e., a fact the administrator relied on to resolve the merits of the claim." Id. at 289. In the pending appeal Vencor continues to cite evidence that was not before the plan administrator. Its brief discusses deposition and affidavit evidence developed during the litigation that we cannot consider. While Vega states that evidence that was not submitted to the administrator can be considered if it "assists the district court in understanding the medical terminology or practice related to a claim," id. at 299, we read this discussion as recognizing a narrow exception to the general rule that the district court

4

should confine itself to the administrative record. Extraneous evidence cannot be considered to resolve the basic factual question of whether Lakwyk needed acute care as opposed to custodial care, i.e., "a fact the administrator relied on to resolve the merits of the claim itself." Id.

In Vega, we also held that "the district court may not impose a duty to reasonably investigate on the administrator." Id. at 299. Hence, we cannot agree with authority which, according to Vencor's brief, requires that "[a]n ERISA fiduciary must throughly investigate a claim to properly discharge his or her fiduciary duty."

Vega does however hold that, under the abuse of discretion standard, the court should not simply rubber stamp the decision of the plan administrator:

> Plainly put, we will not countenance a denial of a claim solely because an administrator suspects something may be awry. Although we owe deference to an administrator's reasoned decision, we owe no deference to the administrator's unsupported suspicions. Without some concrete evidence in the administrative record that supports the denial of the claim, we must find the administrator abused its discretion.

Id. at 302. We are satisfied that the district court understood this standard and did not err in concluding that the administrator had not abused its discretion.

Seafarers does not contest that Lakwyk arrived at the hospital in critical condition and that his initial care at Vencor was covered by the plan. Seafarers contends, however, that the plan does not cover "custodial" care. The plan summary notes an exclusion from coverage for custodial care and defines such care as "in-patient care provided to the patient because no discharge arrangements could be made." Similar language is found in

5

plan regulations, which define custodial care as "care which is given without medical necessity because no discharge arrangements were accomplished in a timely manner." Seafarers also contends that after Lakwyk's condition stabilized, and based on the information Vencor had provided, the plan did not cover Lakwyk's hospitalization at Vencor after May 14, 1993. It points to documents indicating that Lakwyk was using a walker and a portable ventilator, that he was clinically stable, and that home care and hospital discharge were contemplated in the hospital's records. This decision was made by two physician advisors to the plan, Drs. Miller and Dumlao. Dr. Dumlao attested that "[g]iven the extensive network of medical services and providers in Houston and the Texas Medical Center, we had no doubt that lesser acute medical facilities existed which would accept a ventilator dependent patient and which provided 24-hour respiratory therapy." Miller attested that "Plan Trustees consistently interpret the custodial care exclusion to bar payment when services are rendered to a patient after 'discharge arrangements' begin because discharge arrangements, in and of themselves, indicate that a patient no longer requires acute care."

Vencor submitted a February 7, 1994 letter from Dr. Teague, Lakwyk's treating physician, stating that Lakwyk was "ventilator dependent," that he needed to be at a facility with skilled personnel on site at all times, and that he "requires far more than 'custodial' care." This letter does not establish that the plan abused its discretion. We have not adopted a "treating physician rule" requiring the administrator to accept the

6

opinion of a treating physician. See Salley v. E.I. DuPont de Nemours & Co., 966 F.2d 1011, 1015-16 (5th Cir. 1992).

Vencor also argues that Seafarers did not confirm that a non-acute care facility such as a nursing home was available to take over the care of a ventilator dependent patient such as Lakwyk. After the suit was filed the parties offered conflicting evidence, not presented at the administrative level, as to whether such facilities were available. We cannot agree that Seafarers' failure to locate such a facility prior to denying coverage amounts to an abuse of discretion. First, in our view, requiring Seafarers to make such an investigation runs afoul of the holding in Vega that "the district court may not impose a duty to reasonably investigate on the administrator." Vega, 188 F.3d at 299. Second, we do not read coverage under the plan as turning on the availability of alternative, custodial care in a particular community. For example, we do not interpret the plan as requiring Seafarers to cover all treatments in an acute-care hospital simply because the immediate community has no nursing homes or other outpatient facilities which typically provide non-acute care.

As a matter of plan interpretation, Seafarers did not abuse its discretion in maintaining that coverage for hospitalization under the plan did not extend to non-acute, custodial care of a patient in an acute care facility. As a factual matter, we cannot say that the Seafarers abused its discretion in concluding, based on the administrative record before it, that the plan did not cover Lakwyk's continued care at Vencor.

AFFIRMED.

7

Dennis, Circuit Judge, dissenting:

In <u>Vega v. National Life Insurance Services, Inc.</u>, 188 F.3d 287 (1999) (en banc),

our holding was three-fold: (1) We review ERISA plan administrators' decisions under a

"sliding scale standard....  The existence of a conflict is a factor to be considered in

determining whether the administrator abused its discretion in denying a claim.  The

greater the evidence of conflict on the part of the administrator, the less deferential our

abuse of discretion standard will be."[1]  <u>Id.</u> at 297.  (2) "[W]hen assessing factual

---

[1] In <u>Vega</u>, we set forth and endorsed several similar articulations of the sliding
scale standard.  First, we endorsed our decision in <u>Wildbur v. ARCO Chem. Co.</u>, 974
F.2d 631, 638-42 (5th Cir. 1992) ("We note that the arbitrary and capricious standard may
be a range, not a point.  There may be in effect a sliding scale of judicial review of
trustees' decisions–more penetrating the greater is the suspicion of partiality, less
penetrating the smaller that suspicion is....").  We then noted that,

> [u]nder the "sliding scale" standard, the court always applies the abuse of
> discretion standard, but gives less deference to the administrator in
> proportion to the administrator's apparent conflict.  An example of this
> approach is the Fourth Circuit decision in <u>Doe v. Group Hospitalization &
> Medical Services</u>, 3 F.3d 80 (4th Cir. 1993):
>> We hold that when a fiduciary exercises discretion in
>> interpreting a disputed term of the contract where one
>> interpretation will further the financial interests of the
>> fiduciary, we will not act as deferentially as would otherwise
>> be appropriate.  Rather, we will review the merits of the
>> interpretation to determine whether it is consistent with an
>> exercise of discretion by a fiduciary acting free of the
>> interests that conflict with those of the beneficiaries.  In short,
>> the fiduciary decision will be entitled to some deference, but
>> this deference will be lessened to the degree necessary to
>> neutralize any untoward influence resulting from the conflict.
> <u>Id.</u> at 86; <u>see also</u> [<u>Chambers v. Family Health Plan Corp.</u>, 100 F.3d 818, 826 (10th
> Cir. 1996)] (holding "that the sliding scale approach more closely adheres to the
> Supreme Court's instruction to treat a conflict of interest as a 'facto[r] in

8

questions, the district court is constrained to the evidence before the plan administrator. ...[T]he administrative record consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it." Id. at 299-300. (3) "Although we owe deference to an administrator's reasoned decision, we owe no deference to the administrator's unsupported suspicions. Without some concrete evidence in the administrative record that supports the denial of the claim, we must find the administrator abused its discretion." Id. at 301.

Applying the holdings of Vega, by using a less deferential abuse-of-discretion standard because of the administrator's conflict of interest with those of the plan beneficiaries,[2] and reviewing the merits of the administrator's interpretation of the

determining whether there is an abuse of discretion'"); Sullivan v. LTV Aerospace & Defense Co., 82 F.3d 1251, 1255 (2d Cir. 1996); Taft v. Equitable Life Assurance Soc'y, 9 F.3d 1469, 1474 (9th Cir. 1993); Van Boxel v. Journal Co. Employees' Pension Trust, 836 F.2d 1048, 1052-53 (7th Cir. 1987).

Vega, 188 F.3d at 296.

[2] The majority correctly observes that the plan is a nonprofit Taft-Hartley trust operated by an equal number of non-beneficiary management and employees, rather than a for-profit insurance company. That distinction, however, does not dispell the existence of a conflict between the nonprofit plan's interest and the interest of an individual beneficiary-claimant. Altruistic and high-minded causes can inspire partiality or bias as much as base, selfish motives. Though denials of claims of beneficiaries by nonprofit funds may not lead to increased earnings or executive benefits, they directly impact the fund within the fiduciaries' charge. The trouble with all this, of course, is that the slide of the scale and the severity of the conflict call for purely subjective adjustments by appellate courts having only scant knowledge of the true dynamics involved in a particular case.

9

administrative record to determine whether it is consistent with an exercise of discretion free of the interests that conflict with those of the beneficiaries, I conclude that the concrete evidence in the record does not support the denial of the claim and that the administrator abused its discretion.

The concrete evidence in the record does not support a reasonable finding that Mr. Lakwyk was ever given medical treatment that was not necessary; that he ever recovered his health sufficiently to be moved to a less intensive care facility or such that his care at Vencor could be deemed "custodial"; or that Vencor did not diligently take all reasonable measures to promote his recovery to the extent that he could be discharged to such a facility.

The administrative record reflects that, from January 29 through February 3, 1993, though Mr. Lakwyk "[t]olerated trach collar trials ... up to 6-8 hours per day," he experienced "increased shortness of breath" and had to have a ventilator pressure support of 10; that, by February 3, his lungs were "moving less air"; that, from February 11 through 19, though he was "walking on portable vent, slowly weaning ... up to 3 hours off vent," he would "not wean completely due to right diaphragm paralysis"; that his doctor established purely as a "[g]oal[] to wean to trach collar during the day"; that, by February 24 through March 3, Mr. Lakwyk was "[t]olerating [trach collar] trial only 1-2 hours per day" and that his lungs were unable to function on the ventilator without assist control and pressure support; that, if no further progress was made, "discharge planning" would begin within a week; that, during the week of March 6 through 11, he tolerated the trach

10

collar for 7 hours and could walk for 1000 feet on a portable ventilator; that, however, by the next week, he had "increase[d] shortness of breath"; that on March 22, he was "[u]nable to tolerate off vent" and was "placed back on vent"; that on March 24, he "[r]emain[ed] on vent all day"; that, between March 27 and April 8, he coughed out his trach tube and had to have it replaced during a special procedure; that, during the same week, "[d]ischarge planning [was] in progress" and he "[c]ontinue[d] to attempt trach trials during the day"; that, on April 9, he was "[c]linically stable"; that, however, by May 9, his condition was "deteriorating" and he was "[l]ess active, weaker[,]" though the staff "[c]ontinue[d] to explore home care options"; that, on May 10, he was "more weak" and "only tolerate[d] short periods off ventilator"; that, on May 10, he had to have his ventilator in assist control mode; that, from May 29 through June 30, he "[r]emain[ed] vent dependent" and could only walk "short distances" on the portable ventilator; that, on July 20, his respiratory failure was progressing; that, on August 1, he "[c]ontinue[d] ventilator dependence" with "[a]dvanced pulmonary dysfunction"; that, on August 6, though "[o]verall feeling [he was] better..., functional level ha[d] gradually been decreasing [and he] [r]emain[ed] on ventilator"; that, on August 14, his ventilator assist control had to be increased to 12 breaths per minute; that, on August 17, his blood gas readings reflected "marked[] impair[ment] ... despite total vent support"; that, on August 20, he was stable and having "a good day"; that, on August 22, he had "increased dyspnea despite ventilator" and could "no longer trigger ventilator 2-3 inspirations for each breath"; that, on August 26, he was "[f]eeling better"; that, on September 8, he was

"slowly deteriorating"; and that, on September 10, he looked comfortable only when "on vent." (Emphasis added). Throughout the time period reflected in the treatment summary, from January 29 through September 10, his blood gas readings remained below normal for oxygen content and above normal for carbon dioxide content, i.e., his lungs were documented as not performing properly without continued acute treatment. The full reading of these notations in Mr. Lakwyk's treatment record, which was before the plan administrator, indicates that Mr. Lakwyk, who had been admitted to Vencor for acute care of his respiratory failure and ventilator dependence, initially saw some improvement due to the aggressive treatment of his doctor, who set as an aspirational goal the eventual discharge of Mr. Lakwyk to home care. But the treatment record goes on to show that this initial temporary improvement was quickly superseded by a long and gradual deterioration of Mr. Lakwyk's condition, despite his doctor's treatment and discharge goals, which saw him unable to be weaned from ventilator dependency, unable to recover from respiratory failure, and unable to breathe under his own power or without the assist control and pressure support of Vencor's ventilator system. The few notations in the treatment record of "good day[s]" or "feeling better" do not specifically reference Mr. Lakwyk's respiratory condition,[3] and, moreover, immediately are followed by notations that Mr. Lakwyk's overall condition remained in decline.

---

[3] While in the hospital, Mr. Lakwyk suffered from a number of other complaints, such as a sore deltoid, nausea, sleepiness, and decreased appetite, any of which could have been the target of the generic notations of "feeling better" or having a "good day."

In light of this record, the administrator's determinations on August 10, October 1, and December 4, 1993, that it would have been medically safe and appropriate to terminate Mr. Lakwyk's medical treatment at Vencor as of May 14, 1993, and to transfer him to another facility, which is neither named nor shown to be capable of providing adequate medical treatment for him in the administrative record, was arbitrary and unreasonable.  Consequently, there is no warrant in the record or reasonable basis in the plan for the administrator's denial of the claim.  Accordingly, I respectfully dissent.